630 So.2d 979 (1994)
FSC SECURITIES CORPORATION
v.
Melvin W. McCORMACK.
No. 89-CA-0293.
Supreme Court of Mississippi.
January 13, 1994.
J.P. Coleman, Coleman & Coleman, Ackerman, C. York Craig, Jr., H. Mitchell Cowan, Watkins Ludlam & Stennis, Jackson, for appellant.
James E. Lambert, Lambert & Bailey, Jackson, for appellee.
En Banc.

ON PETITION FOR REHEARING
PITTMAN, Justice, for the Court:

STATEMENT OF THE CASE
The original opinion is withdrawn and this opinion is substituted therefor.
This appeal arises from a December 28, 1988, judgment of the Hinds County Chancery Court against the Appellant, FSC Securities Corporation, a securities broker-dealer. The Chancellor found that FSC Securities was vicariously liable under the doctrine of respondeat superior for the tortious acts of Donald Manuel ("Manuel"), a registered representative who converted for his own use funds belonging to an investor, Appellee Melvin McCormack ("McCormack").
McCormack filed suit on August 17, 1987, against Manuel, Financial Services Limited, and Appellant FSC Securities Corporation. Financial Services Limited is a Mississippi corporation, which served as the operative base for Manuel's various financial ventures. Also named in the suit were a variety of limited partnerships owned or controlled by *980 Manuel under the aegis of Clearwater Communication Company: Radio Associates I, Radio Associates III and Radio Associates IV.
A bench trial was held on November 14-16, 1988. The Chancellor found that FSC Securities was vicariously liable for Manuel's actions, holding that he was an agent and acting within the scope of his employment. Further, the Chancellor found that FSC Securities, together with Manuel and Financial Services Limited, Inc., was jointly and severally liable to McCormack for actual damages in the amount of $184,333.49. Finally, the Chancellor ordered FSC Securities to pay $500,000.00 in punitive damages, with one-half of that sum to be paid to the State of Mississippi by the McCormacks because "to allow this full sum to the Plaintiffs would amount to a windfall to the Plaintiff, and it would overly compensate the Plaintiff for their efforts [sic] in bringing this cause to the public's attention."
On January 9, 1989, FSC Securities filed a motion for rehearing, or in the alternative, for alteration or amendment of the final judgment. The motion was denied on February 10, 1989. Feeling aggrieved, FSC Securities appeals to this Court, asserting that:
I. The Chancellor erred in determining that the Appellant is vicariously liable for the tortious acts of Don Manuel, where all the evidence showed that Manuel was not acting within the scope of his agency with FSC Securities when he committed such acts;
II. Where there was no finding of any wrongful conduct by the Appellant, the Chancellor erred in awarding punitive damages against FSC Securities;
III. The Chancellor erred in deciding sua sponte that the State of Mississippi should be added as a party after the conclusion of the trial for the sole purpose of being the recipient of $250,000 in punitive damages; and
IV. The $500,000 punitive damages award in this case is excessive and violative of the Constitutions of the United States and the State of Mississippi.

STATEMENT OF THE FACTS

I. The Parties

FSC Securities Corporation
FSC Securities Corporation, a Delaware corporation with headquarters in Atlanta, Georgia, is a securities broker-dealer licensed in Mississippi. FSC Securities is a member organization of the National Association of Securities Dealers (NASD) and as such, must abide by its rules, regulations and guidelines. As a broker-dealer, it is authorized to only sell securities through its network of registered representatives.

Don Manuel
Don Manuel, a former Baptist preacher, was affiliated with FSC Securities as a registered representative from August 22, 1984, until February 8, 1988. During that time, he generated only $900-$1,000 in commissions on transactions cleared through FSC Securities, most during the first year he was associated with the firm. The record indicates that Manuel focused his energies instead on buying, selling and managing radio stations, or perhaps, more aptly, creating quasi-corporate structures through which he sold and marketed limited partnerships to the unsuspecting public, ostensibly for the purpose of investing in radio stations.[1] These limited partnerships each had less than thirty five (35) investors, all Mississippi residents, who generally purchased $2,500 partnership units. Manuel also dabbled in so-called "pre-syndication" deals, short-term "investments" in unprocured radio licenses. Financial Services Limited appears to have functioned merely as a "door opener" for the many investment opportunities he had to offer.

Melvin McCormack
In August 1987 the Appellee, Melvin McCormack, took early retirement from the Irby Construction Company. During the thirty-three years that he worked for the *981 company, McCormack had accumulated over $300,000.00 in his pension and profit-sharing plan. He received his first disbursement from the plan of some $150,000.00 on January 7, 1987.
McCormack holds a degree in agricultural engineering from Mississippi State University. His wife, Eva, who managed the family's investments, is a licensed real estate agent. The record indicates that while the McCormacks may have been less than astute in their investment decisions, they were not unsophisticated investors. They owned several rental properties as well as church bonds and certificates of deposit. Through their accountant, Kay Humphrey, who had been recommended by a co-worker, they had placed $12,500.00 in a tax shelter in late 1986.[2] It was Humphrey who recommended that they meet with a financial advisor, Don Manuel, about placing the disbursement from McCormack's pension and profit-sharing plan in an IRA Rollover.

II. The Manuel-FSC Securities Corporation Relationship
The majority of FSC Securities' registered representatives are financial planners or other service professionals who transact some securities trades ancillary to their principal businesses, such as insurance, real estate, accounting or tax planning. John Porter, Chief Compliance Officer for FSC Securities, indicated that FSC knew that Manuel was primarily in the radio business. He testified that the company was unaware, however, that Manuel operated his company under the name of Financial Services Limited, which, because of the similarity of the names, would have been prohibited. Manuel stated that he did expressly inform FSC Securities that he was also in the business of syndicating radio station limited partnerships, but that it was "just understood that [he] was in the radio business." He maintained throughout his testimony that "I did not consider FSC Securities Corporation to be a part of my business."
All prospective registered representatives are required to submit a standard industry Form U-4, comparable to the Mississippi Bar application form, to FSC Securities. The registration material is then forwarded to the NASD for final approval. Manuel was hired on the basis of the information given on the U-4 form and a telephone interview.
Manuel, like FSC Securities' other registered representatives, was by the terms of his contract agreement, an "independent contractor." The scope of his employment with FSC Securities was limited to the solicitation of securities approved by the broker-dealer. FSC is required by the NASD to supervise and control those transactions which are actually cleared through it. This obligation does not extend to those transactions wherein the registered representative is "selling away," dealing in unauthorized securities, clearing through another broker-dealer any investments that are approved by FSC Securities, or transacting business that does not appear on its books or records. FSC Securities understandably takes the position that such transactions are beyond the scope of the employment agreement.
The NASD requires broker-dealers to make annual reviews of their registered representatives. Manuel had only done $970.00 in business with FSC Securities over a three year period. Accordingly, he had not been reviewed.
On June 12, 1987, FSC Securities received a complaint from one of Manuel's clients, Jack Klinger, a witness but not a party to the case sub judice. Immediately thereafter, on June 17, John Porter travelled to Greenville to investigate the complaint and Manuel's business activities. He suspended Manuel on June 19, having the opinion that Manuel was probably in violation of the securities laws. The NASD was then notified of Manuel's suspension. He was officially terminated on February 8, 1988.

III. The McCormack-Manuel Transaction
There are many discrepancies in the testimony given by Manuel and the McCormacks, *982 especially with regard to representations made by Manuel about his professional affiliations and the McCormack's investment objectives. Accordingly, the undisputed facts of the transaction will be discussed first, followed by supplemental details which illuminate the discrepancies in the parties' recollections and perceptions.

A. The Undisputed Facts
The McCormacks first met Manuel in early February 1987 at the Vicksburg office of their accountant, Kay Humphrey (Humphries). At that meeting, Manuel gave them his business card, which had the name Financial Services Limited in the upper left corner, Manual's name in the center, and the words "Registered Representative FSC Securities Corporation NASD-SIPC" along the bottom in small print. He also gave them a twenty-eight page brochure explaining in layman's language the procedure for establishing an Individual Retirement Account (IRA) with Continental Trust Company of Dallas, Texas, as trustee. The cover of the brochure boldly proclaimed, as represented below:

SELF-DIRECTED INDIVIDUAL RETIREMENT ACCOUNT

FSC SECURITIES CORPORATION

CONTINENTAL TRUST CORPORATION
Page 22 of the brochure provides instructions for the establishment of the IRA. It directs the grantor (the individual whose funds will be placed in the account) to make checks for the funds to be placed in the account and trustee fees payable to Continental Trust Company. It further states:
Upon acceptance of the IRA plan, Continental Trust Company will complete the investment instructions provided by the Grantor and mail an acknowledgement letter (including a copy of the accepted Adoption Agreement) to the Grantor.
Send all applicable forms to:
Financial Service Corporation Broker Service Dept.-IRA 250 Piedmont Ave., N.E. Suite 1900 Atlanta, Georgia 30365
It should be noted that this mailing address is one of very few references to FSC Securities' parent corporation, Financial Service Corporation, in the material that the McCormacks received from Manuel.
Manuel next met with the McCormacks at their home in Jackson on March 3, 1987. At that time, Mrs. McCormack gave him a check for $150,000.00 made payable to Financial Services Limited. The memo designation on the check reads "IRA roll over." The endorsement stamp on the reverse of the check indicates that it was deposited in Manuel's Financial Services Limited account. At the March meeting, the McCormacks filled out and signed a "Designation of Beneficiary" form for the IRA. They also signed, but did not otherwise fill out various other forms including a trading authorization and an options trading agreement.
On March 13, 1987, Manuel sent McCormack a letter, which reads as follows:
Dear Mr. McCormack,
Thank you for the confidence you've shown placing your IRA business with our firm. We plan to give your account personal attention and care, which will allow you to express confidence in us. Enclosed are copies of the forms filed now. Any remaining forms will be filed as called for. I will be in contact shortly.
Sincerely,
Don Manuel
P.S. I have made inquiries concerning the Browning 270 and 30-06 and the Remington 270 and 30-06. Browning is scarce. I think we will find you a bargain.
The note was typed on stationery which had a "FINANCIAL SERVICES LIMITED" letterhead printed in a large typeface across the top of the page, followed by Manuel's Greenville address. The following logo was printed in small typeface across the bottom of the page:

SECURITIES TRANSACTIONS THROUGH FSC SECURITIES CORPORATION

A REGISTERED BROKER DEALER
MEMBER NASD MEMBER SIPC
*983 The McCormacks and Manuel met again in early April after Mrs. McCormack expressed some concern about the status of the IRA account. At that time Manuel gave them a check dated April 10, 1987, drawn on the Financial Services Limited account for $586.71. That check was designated as interest paid on the McCormack's $150,000.00.
At the April meeting, Manuel finally gave McCormack a receipt for the March 3, 1987, check. It read as follows:
I, as agent for Financial Services Limited, have received $150,000 from Melvin W. McCormack, and am instructed to place this money at work earning interest, and by June 1, 1987, to have the entire fund placed in an IRA rollover account with Continental Trust Company of Dallas, Texas, as custodian.
Manuel entered several transactions through FSC Securities in an account styled "Melvin McCormack, A/C Continental TR CC." McCormack's July 15, 1987, IRA statement from Continental Trust Company indicates that the account was initially funded with $500.00 on May 21, 1987. An additional $10,000.00, designated as a rollover contribution, was received into the account on June 27, 1987. Dividends of $978.78 were received into the account on July 10, 1987. Nowhere does the record indicate that the full amount of Mr. McCormack's $150,000.00 was placed in the Continental Trust Company account or invested in securities through FSC Securities.

The McCormacks
Both Mr. and Mrs. McCormack emerged from their March 3, 1987, meeting with Manuel under the impression that $150,000.00 was to be placed in an IRA Rollover account. Although they had had the IRA Rollover brochure from Continental Trust Company for nearly a month, they admitted that neither had read it and depended on Manuel to explain it to them. Both testified that Manuel told them to make the check payable to Financial Services Limited.
The McCormacks further asserted that they gave instructions to Manuel to buy two $25,000.00 lots of GNMA bonds and to place the remaining $100,000 in an interest bearing account within the IRA Rollover. They believed that those funds would be placed in a money market fund yielding 7 percent. Although it appears that Manuel and McCormack discussed the many investment options available with a self-directed IRA, they assert that investing in Manuel's radio scheme was not among them. McCormack further stated that they did not discuss investing in a "pooled" account with Financial Services Limited.
The McCormacks testified that Manuel held himself out to them as a representative of FSC Securities and that they believed him to be an agent of a large broker-dealer. Mr. McCormack, in particular, asserted at trial that he didn't realize that there was a difference between Manuel's operation, Financial Services Limited and FSC Securities Corporation and its parent corporation, Financial Service Corporation. Mrs. McCormack, sensing some distinction between the two entities, testified that:
Q. You understood that he was president of Financial Services Limited. That was your deposition testimony, Mrs. McCormack. You're not denying that this morning, are you?
A. I'm assuming that, but I don't know whether he told me that he was president or not. Our main concern is he had presented himself as a registered representative of FSC Securities Corporation, which I said  before I had said Financial Services Corporation.
Q. But you understood that he was president of a separate company apart from FSC Securities Corporation?
A. That was my assumption.
Although the McCormacks first became concerned about the investments they had made in April, they initially took no action beyond attempting to transfer the IRA to Deposit Guaranty National Bank. They called Manuel and Continental Trust Company several times before talking with their banker at Deposit Guaranty National Bank, F.E. Brasfield, Jr., who in turn, wrote to Manuel on May 4, 1987, requesting the transfer. The McCormacks apparently made no effort to contact FSC Securities directly *984 about the IRA transfer or Manuel's conduct. Mrs. McCormack testified on cross-examination as follows:
Q. At that time you had never written or called FSC Securities Corporation?
A. I felt like I had contacted FSC Securities Corporation every time I talked to your representative, Don Manuel.
Q. Mrs. McCormack, if you'll answer the question first, then you can explain. Did you ever contact the FSC office in Atlanta about Don Manuel?
A. Not in Atlanta, no except the letters that Mr. Brasfield wrote I thought went to FSC Securities and the Continental Trust, I don't know. [pause] Or perhaps Continental Trust notified FSC Securities in that letter. I don't know exactly how that was set up.

Manuel
Manuel does not deny that the McCormacks ultimately sought to have the pension and profit sharing distribution placed in an IRA Rollover. He asserts, however, that there was no urgency in establishing the rollover account and that the McCormacks sought a short-term, high yield investment to achieve the maximum return before rolling over the funds.[3]
He testified that the McCormacks were interested in "playing the market" as well as in investing in "pre-syndication radio partnerships," short-term "bridge loans" to finance unprocured radio licenses. Manuel stated that the McCormacks gave him no specific instructions when he received the check. He further contended that it was at the trial that he for the first time heard about the McCormack's intent to initially fund the IRA rollover with two $25,000.00 GNMA purchases.
Manuel testified that he did not perceive himself as acting as an agent or representative of FSC Securities in his dealings with the McCormacks:
Q. Mr. Manuel, when did you take off your hat as registered representative for FSC and put on your hat as representing yourself, if that's what you claim to do, to put this investment in the pooled account?
A. I don't think I ever put my hat on as an FSC rep.
Q. You gave them a card with FSC on it, didn't you?
A. I gave them a card with Financial Services Limited on it which simply states that the securities were traded through FSC Securities Corporation.
Manuel further explained that his discussion of FSC Securities with the McCormacks was quite limited. He testified that:
I told Mr. and Mrs. McCormack  and these are the words that were used  any securities trades which are done will go through FSC Securities Corporation. I don't know that they understood that and its implication, but what was meant by that to convey to them is that if there were any investments which required trading on the floor or in an exchange, it would go through the broker-dealer, FSC Securities Corporation. I didn't spend a lot of time with that because they were not interested in that. Their primary concern was to put this money to work at an above-bank rate.
Manuel indicated that he understood that the McCormacks intended for the money to be placed with his company, Financial Services Limited, and that the check had been made out to Financial Services Limited before he arrived at the McCormack's home, without any direction from him. He later testified that:
Mr. and Mrs. McCormack are very capable of making their own decisions, and they did make their own decisions. They voluntarily and freely invested their money by giving it to FSL [Financial Services Limited] and telling FSL "make us some money."
Consequently, the McCormack's money was placed in the Financial Services Limited *985 checking account, where, in addition to providing 30 to 120 day "bridge loans" to Manuel's radio stations, it helped to finance, among other things, a sailboat and two new Mazda automobiles.

I. DID THE CHANCELLOR ERR IN DETERMINING THAT THE APPELLANT IS VICARIOUSLY LIABLE FOR THE TORTIOUS ACTS OF DON MANUEL, WHERE ALL THE EVIDENCE SHOWED THAT MANUEL WAS NOT ACTING WITHIN THE SCOPE OF HIS AGENCY WITH FSC SECURITIES WHEN HE COMMITTED SUCH ACTS?
The parties do not dispute that Don Manuel acted tortiously in converting McCormack's funds for his own use and that of Financial Services Limited. However, the Appellant asserts that the Chancellor erred in finding that FSC Securities was vicariously liable for Manuel's acts because he was acting well outside the scope of any agency relationship.
The Chancellor's findings do not specify the basis for his finding that Manuel was an agent of FSC Securities Corporation. FSC Securities Corporation contends that Manuel was an "independent contractor." Rather than getting mired in the semantics of the nature of the agency relationship, the parties properly have focused on the issue of whether Manuel acted within the scope of his employment with FSC Securities Corporation in his transactions with the McCormacks. The Chancellor's opinion, as the Appellant points out, failed to define the scope of Manuels' employment with FSC Securities. He opined merely that:
Manuel had the authority to solicit the business and the IRA's, that Manuel would be accepting the check for FSC, because they are required to supervise all of the associated persons.
Federal and state courts in other jurisdictions have been reluctant to find broker-dealers vicariously liable for the underhanded dealings of registered representatives in circumstances similar to the case sub judice. These cases have turned on the doctrine of apparent authority. Mississippi likewise follows the doctrine of apparent authority except when specified otherwise by statute. Terrain Enterprises, Inc. v. Western Casualty and Surety Co., 774 F.2d 1320, 1322 (5th Cir.1985), cert. denied, 475 U.S. 1121, 106 S.Ct. 1639, 90 L.Ed.2d 184 (1986). As the Court of Appeals explained:
An act is considered to be within the agent's apparent authority when a third party is justified in concluding that the agent is authorized to perform it from the nature of the duties which are entrusted to him. McPherson v. McLendon, 221 So.2d 75, 78 (1969). Apparent authority is to be determined from the acts of the principal and requires reliance and good faith on the part of the third party. Tarver v. J.W. Sanders Cotton Mill, 187 Miss. 111, 192 So. 17 (1939).
774 F.2d at 1322.
In Barker v. FSC Securities Corporation, 133 F.R.D. 548 (W.D.Ark. 1989), the analysis of the apparent authority has been further clarified. The court in Barker stated that:
The first element of apparent authority is whether the principals knowingly or negligently permitted their agents to claim that they were acting within the scope of their authority. This element involves the conduct of the principal rather than that of the plaintiff.
133 F.R.D. at 551.
The Chancellor did not make any findings that FSC Securities was negligent in hiring or supervising Manuel. There is no evidence in the record either to suggest that FSC Securities had any knowledge of Manuel's unauthorized activities, as was a determinative factor in the cases noted below. Moreover, once FSC Securities received notice from another Manuel customer, he was immediately investigated and suspended.
In Durham v. Waddell & Reed, Inc., 723 S.W.2d 129 (Tenn. Ct. App. 1986), the court found that the broker-dealer was not liable for its representative's unauthorized bond sale because even though the plaintiff established that she relied on the registered representative's apparent authority to deal in securities with Waddell & Reed, as in the case sub judice, there was no showing in the record that the broker-dealer "had either actual or constructive notice of the unauthorized *986 acts in time to prevent the sale or to ratify it" or that it "explicitly or implicitly permitted the unauthorized sale." Id. at 131.
In Cover v. Cushing Capital Corporation, 344 Pa.Super. 593, 497 A.2d 249 (1985), the Pennsylvania court affirmed the lower court's finding that the broker-dealer was not vicariously liable for its registered representative's scheme to convert his clients' funds for his own use through the unauthorized sale of nonexistent commercial paper. Although somewhat distinguishable from the case sub judice because the defrauded investors had dealt with the registered representative before he joined Cushing Capital, the other factual circumstances of the case are quite similar: the broker-dealer did not know that the investors were giving money to the registered representative, or how much they had given to him; and they had not had any direct communications with Cushing Capital or made any direct inquiry to the broker-dealer regarding their "investments." Id. at 252. Accordingly, the court found that:
He [the registered representative], and he alone was engaged in the scheme to defraud. His scheme was outside the scope of his employment and was antagonistic to the principal. The evidence showed and the trial court found that Cushing Capital had no knowledge of Fugh's personal machinations, which were calculated to line his pockets at the expense of his friends and customers. Under these circumstances, Cushing Capital was not obligated to answer vicariously for the losses sustained as a result of Fugh's peculations.
Id. at 252-253.
The court in Barker further stated that:
The second element of apparent authority requires an inquiry into the reasonableness of plaintiff's beliefs, as opposed to the reasonableness of defendant's action or inaction.
133 F.R.D. at 551.
Although Mr. and Mrs. McCormack both testified that they relied on Manuel as a representative of FSC Securities, there is substantial evidence in the record to challenge the reasonableness of their beliefs, to wit: their failure to read the information Manuel had given them as well as his stationary and business card, which identified him primarily as president of Financial Services Limited. The McCormacks had no contact with FSC, made no effort to follow their investment through FSC and relied on and dealt only with Manuel. Further, Manuel explicitly stated in his receipt that he accepted the funds from them as an agent for Financial Services Limited rather than FSC Securities.
The record clearly indicates that Manuel as well as FSC Securities' other registered representatives act within the scope of employment only when soliciting or transacting business in securities approved for sale by the broker-dealer. As a member firm of the NASD, FSC Securities is required to supervise and control those securities transactions made by its registered representatives which are cleared through the broker-dealer. We find the evidence does not support the Chancellor's finding that Manuel was an agent of FSC Securities Corporation. It is clear Manuel was acting outside the scope of his representative status with FSC, and further that the McCormacks had notice, although they might have ignored it, that Manuel was acting for Financial Services Limited, not FSC.

II. WHERE THERE WAS NO FINDING OF ANY WRONGFUL CONDUCT BY THE APPELLANT, DID THE CHANCELLOR ERR IN AWARDING PUNITIVE DAMAGES AGAINST FSC SECURITIES?
The punitive damages judgment against FSC Securities appears to be predicated solely upon the Chancellor's opinion that the company is liable for Manuel's actions under the doctrine of respondeat superior. Noting Manuel's impecunious financial state, he further opined that:
It is obvious to the Court and to the parties that unless some responsibility is placed on FSC, then the Plaintiff will neither recover his money nor will the wrong be remedied in this case ...
In his conclusions of law, the Chancellor made no finding that FSC Securities had been negligent either in hiring or supervising Manuel. McCormack had alleged in his initial *987 complaint only that FSC was negligent in hiring Manuel. The claim of negligent supervision was not raised until this appeal. Accordingly, FSC Securities contends that the Chancellor erred in rendering the judgment against it.
Having reversed the chancellor's finding as to the agency of Manuel vel non, the punitive damage award cannot stand. Accordingly, the Chancellor erred in levying punitive damages against FSC Securities and are mentioned in this opinion so that we may approach the issue concerning the award of punitive damages to the State.

III. DID THE CHANCELLOR ERR IN DECIDING SUA SPONTE THAT THE STATE OF MISSISSIPPI SHOULD BE ADDED AS A PARTY AFTER THE CONCLUSION OF THE TRIAL FOR THE SOLE PURPOSE OF BEING THE RECIPIENT OF $250,000.00 IN PUNITIVE DAMAGES?
The Chancellor, after assessing punitive damages of $500,000.00 against FSC Securities, determined that the McCormacks should pay half of that amount to the State of Mississippi. Citing M.R.C.P. 71, he made the state a party to the suit for purposes of receiving the award. He opined as follows:
The reasoning here is that the Plaintiff has brought this action and terminated such activity insofar as these Defendants are concerned. On the other hand, the State of Mississippi, through the Secretary of State and the Attorney General's Office, has gone to considerable expense, time and trouble in this cause in order to protect the public interest. To satisfy the public interest, which this Court is bound to protect, then the Court directs the Plaintiff to pay one-half of the sum, in the amount of $250,000, to the State of Mississippi, and hopefully the State will utilize these funds to work with the Attorney General's Office, Consumer Protection Division, and the Secretary of State's Securities Division to insure that no other citizen of this State shall lose their funds as did the Plaintiff in this cause.
Under Rule 71, the Court therefore makes the State a party for this purpose, and under § 28 of Griffith's, mentioned above, feels that this is necessary to see that equity and justice is done in this cause, and that the Court fulfills its duty to protect the public from such incident occurring again...
M.R.C.P. 71 provides that:

When an order is made in favor of a person who is not a party to the action, other than a creditor of a party in a divorce proceeding, he may enforce obedience to the order by the same process as if he were a party; and when obedience to an order may be lawfully enforced against a person who is not a party, he is liable to the same process for enforcing obedience to the order as if he were a party. (emphasis added)
The Comment to M.R.C.P. 71 further states that "Rule 71 makes all orders fully enforceable in favor and against all persons who are properly affected thereby, even though not parties to the action." (emphasis added) Despite the plain language of M.R.C.P. 71, which gives a non-party the same rights as a party, the Chancellor expressly made the State a party for purposes of sharing the judgment with the McCormacks. This Court has found neither statutory nor common law authority for his action.
The Chancellor's initiative highlights judicial discussion of innovation in regard to punitive damages. However, if the State is to be a beneficiary of punitive damages awarded in a private civil action regarding securities, authority to make it so must come from the Legislature. It is in that body's law-making prerogative to decide when the State should invade a private legal action. Accordingly, the Chancellor erred in sua sponte making the State a party for the purpose of receiving part of the award.

CONCLUSION
Although Manuel may have acted within the scope of his employment in opening an IRA account for McCormack, he stepped over the line when he introduced him to investments not authorized by FSC Securities and accepted and deposited McCormack's check made payable to Financial Services Limited. Furthermore, FSC Securities *988 had no knowledge of his activities and, indeed, no knowledge of investments by McCormack in Manuel's corporation. Therefore, the Chancellor erred in finding the broker-dealer vicariously liable for Manuel's actions.
The Chancellor did not find that FSC Securities was guilty of any negligence in the hiring of Don Manuel and the issue of negligent supervision was not raised until this appeal. Absent evidence that FSC Securities was grossly negligent, the award of punitive damages must be reversed. Furthermore, the Chancellor erred in sua sponte making the State a party solely for the purpose of sharing in the punitive damage award. Accordingly, the Chancellor's judgment against FSC Securities Corporation is reversed.
REVERSED AND RENDERED.
SULLIVAN and JAMES L. ROBERTS, Jr., JJ., concur.
HAWKINS, C.J., specially concurs with separate written opinion.
McRAE, J., concurs in part and dissents in part with separate written opinion joined by BANKS and SMITH, JJ.
DAN N. LEE and PRATHER, P.JJ., not participating.
McRAE, Justice, concurring in part and dissenting in part:
The majority has found as a matter of law that Donald Manuel was not acting as an agent of or under the control of FSC Securities Corporation when he converted the McCormacks' money. In light of the plethora of law and rules supporting a contrary conclusion, I disagree.
FSC Securities registered Manuel as its agent in Mississippi with the Secretary of State. Nevertheless, the securities firm described Manuel as an "independent" agent. A so-called "independent" agent, however, is still an agent and thus subject to the control of the principal he represents. We should remember that securities brokerage companies like FSC often hire two kinds of agents. On one hand, there are agents who arrange securities transactions as exclusive, full-time employees of the company. On the other hand, securities companies sometimes hire agents whom the company knows will engage in other types of non-securities financial transactions separate and apart from the business of the securities company. When such an agent handles a securities transaction, however, he is obligated to act exclusively on behalf of the securities company for which he is an agent. While doing so, he is clothed with the authority of his principal, and the principal is accountable for his actions. Manuel falls into the latter category.
Manuel is unquestionably an agent of FSC Securities under the federal Securities Exchange Act. See 15 U.S.C. § 78c (1981). Further, Mississippi caselaw defines Manuel as an agent of FSC Securities. In Mississippi, agency exists when one acts under either the express or apparent authority of a principal. Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172 (Miss. 1990); Malta Life Ins. Co. v. Estate of Washington, 552 So.2d 827 (Miss. 1989); Scott v. Transport Indem. Co., 513 So.2d 889 (Miss. 1987); Baxter Porter & Sons Well Servicing, Inc. v. Venture Oil Corp., 488 So.2d 793 (Miss. 1986); Hardy v. Brantley, 471 So.2d 358 (Miss. 1985); Consumers Credit Corp. v. Swilley, 243 Miss. 838, 138 So.2d 885 (1962). Manuel qualifies on both counts. It is undisputed that Manuel was properly registered pursuant to Miss. Code Ann. § 75-71-301 (1972), as a representative of FSC Securities during the period of his dealings with the McCormacks. FSC Securities authorized and allowed him to carry and distribute a business card which described him as "Registered Representative FSC Securities Corporation NASD-SIPC." The IRA brochure he gave to the McCormacks was styled:

SELF-DIRECTED INDIVIDUAL RETIREMENT ACCOUNT

FSC SECURITIES CORPORATION

CONTINENTAL TRUST CORPORATION
The brochure also directed that all applications be sent to Financial Service Corporation, the parent corporation of FSC Securities.
*989 The stationery on which Manuel corresponded with the McCormacks displayed a logo which read:

SECURITIES TRANSACTIONS THROUGH FSC SECURITIES CORPORATION

A REGISTERED BROKER DEALER
MEMBER NASD MEMBER SIPC
Though Manuel's contract with FSC Securities may have described him as an "independent contractor," the facts surrounding his relationship with FSC Securities show otherwise. Clearly, Manuel was an agent of FSC Securities under any reasonable reading of our common law.
In any event, Manuel is deemed to be an agent of and under the control of FSC Securities according to the National Association of Securities Dealers' own internal regulations. NASD Notice to Members 86-65 provides:
A significant number of NASD members employ registered persons who engage in securities-related activities, on a full- or part-time basis, at locations away from the offices of the members. These off-site representatives, often classified for compensation purposes as independent contractors, may also be involved in other business enterprises such as insurance, real estate sales, accounting or tax planning. They may also operate as separate business entities under names other than those of the members... . Irrespective of an individual's location or compensation arrangements, all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with NASD rules governing the conduct of registered persons and the supervisory responsibilities of each member. The fact that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

(Emphasis added). It is thus apparent that even under the NASD's own rules, Manuel is considered an employee of FSC Securities despite being called an "independent contractor" for compensation purposes.
While it is not the role of this Court to enforce the internal rules of the NASD, we must remember that FSC Securities does not gratuitously submit itself to those obligations. By holding itself out as a member of NASD through letterheads and other indicia of membership, FSC Securities proclaims to the public that it can be relied upon to uphold the standards established by the NASD. By seeking to circumvent the responsibilities imposed by NASD rules, therefore, FSC Securities engages in what amounts to a betrayal of public confidence.
The doctrine of respondeat superior holds employers accountable for the wrongful acts of their employees. This Court has previously held that the doctrine of respondeat superior applies to the employers of independent contractors where the contractor acts in the name of the employer. See Hardy, 471 So.2d at 369-371 (Miss. 1983); Mitchell v. Eagle Motor Lines, 228 Miss. 214, 87 So.2d 466 (1956). FSC Securities, therefore, cannot escape liability for Manuel's actions merely by describing him as an "independent" agent. While Manuel may have been "independent" in the sense that he was free to conduct non-securities transactions apart from his relationship with FSC Securities, that "independence" does not absolve FSC Securities of liability for acts Manuel committed while acting on FSC's behalf.
The majority contends that Manuel was acting on his own, and not on FSC's behalf, when he converted the McCormacks' money. The majority's reasoning misses the point entirely. The test of agency looks to the time when Manuel took the money from the McCormacks; it is not concerned with the particulars of how he later mishandled the funds. When Manuel received the money from the McCormacks, he was clearly acting on behalf of FSC Securities. He held himself out as FSC's agent, he used FSC's brochure, and he used a business card and stationery which bore FSC's name. Under his "apparent authority," he even conveyed $10,000.00 of the money to FSC Securities for investment in a GNMA trust. What actually happened to the money has nothing to do *990 with whether Manuel was acting as FSC's agent while dealing with the McCormacks. What if Manuel had intended to deliver the entire sum to FSC, but negligently lost it on the way? In that factual setting, no one could reasonably argue that FSC Securities should not be held liable for its agent's carelessness. The same rationale applies to the facts in this case. Regardless of whether an agent loses a client's money or converts it to his own use, the principal is responsible. Since the McCormacks delivered their money to a person FSC Securities had authorized to act in its name, FSC Securities is necessarily accountable for the money, no matter what happened to it. I would affirm the trial court's finding that FSC Securities is vicariously liable for the wrongs Manuel inflicted upon the McCormacks.
I also disagree with the majority's decision to reverse the award of punitive damages. The majority seems to focus on the trial court's failure to expressly find that FSC Securities had itself been negligent in hiring or supervising Manuel. Our law, however, has never required that a principal personally commit wrongful acts in order to become liable for punitive damages. See Nichols v. Shelter Life Ins. Co., 923 F.2d 1158 (5th Cir.1991) (Under Mississippi law, punitive damages can be awarded against insurer for agent's fraudulent misrepresentation even where insurer did not ratify misrepresentation); see also Independent Life & Acc. Ins. Co. v. Peavy, 528 So.2d 1112 (Miss. 1988).
Where an agent commits an act worthy of punitive damages, the agent's culpability is imputed to the principal. Therefore, I would affirm the award of punitive damages. I would affirm the award of both actual and punitive damages in favor of the McCormacks but would remand for dismissal of the State of Mississippi as a party plaintiff.
BANKS and SMITH, JJ., join this opinion.
HAWKINS, Chief Justice, specially concurring:
I concur in reversing this case, but write separately because of a slightly different view with the majority opinion. Also, also Part III of the majority opinion is dictum.
I agree with the dissent that injecting "independent contractor" obfuscates. This case turns simply and solely on whether Manuel, an agent of FSC Securities, acted within the apparent scope of his authority. Clearly he had no actual authority from FSC to convert Mr. McCormack's money to his own use.
I disagree with the holding of Durham v. Waddell & Reed, Inc., 723 S.W.2d 129 (Tenn. App. 1986), cited by the majority opinion. Under its facts I would find for the plaintiffs.
This case more nearly fits the cited case of Cover v. Cushing Capital Corp., 344 Pa.Super. 593, 497 A.2d 249 (1985), which held a broker-dealer was not liable, and Badger v. Paulson Investment Co., Inc., 311 Or. 14, 803 P.2d 1178 (1991), which held the investment company liable.
Summarizing the facts, in August, 1986, Mr. McCormack took retirement from his 33-year employment with Irby Construction Company. He knew he had accumulated $300,000 in his pension plan. Both he and his wife, Mrs. Eva McCormack, a licensed real estate agent, were aware that unless he took advantage of an Internal Revenue Service authorized "rollover" plan whereby the money when received could be reinvested in certain government-approved areas of investment within sixty days of its receipt, the pension payment would be treated as ordinary income for income tax purposes. A fellow employee recommended Kay Humphrey to advise the McCormacks. In January, 1987, Humphrey advised the McCormacks to purchase a $12,500 limited partnership interest in Manuel's radio station properties, called "Bolivar-Boyle Limited Partnership," that they could back-date their check to December, 1986, and could reap a tax savings windfall. This investment[1] was made with Manuel before they met him, and, of course, they knew nothing about his relation with FSC Securities.
*991 Thereafter, again upon Humphrey's recommendation, they met Manuel in February, 1987, in her office in Vicksburg for the purpose of discussing investments with him. There is nothing in the record to suggest that prior to meeting him the McCormacks even knew his relationship with FSC Securities. When Manuel met them in Humphrey's office, he told them he was an agent of FSC Securities, and gave them his card, which showed that he was agent. The card in the upper left corner states "Financial Services Limited" and its address in Greenville. The center of the card states "Don Manuel," and just beneath it, "President." There is nothing in the record to suggest that the McCormacks ever inquired of Manuel or anyone else about FSC Securities prior to their investment.
On March 3, 1987, Manuel went to the home of the McCormacks in Jackson, following which they made a check payable to his firm, "Financial Services Limited," in the amount of $150,000. On March 13, 1987, Manuel, on stationery with a Financial Services Limited letterhead, acknowledged they had given their business with "our firm." On April 10, 1987, Manuel wrote them a receipt stating that "I, as agent for Financial Services Limited, have received $150,000 from Melvin W. McCormack, and am instructed to place this money at work earning interest, and by June 1, 1987, to have the entire fund placed in an IRA rollover account with Continental Trust Company of Dallas, Texas, as custodian."
When the McCormacks became suspicious of their investment, they made no inquiry to FSC Securities, but only to Manuel, and later to Continental Trust Company.
In this case Manuel actually had very limited and spasmodic dealings with FSC Securities. In his solicitation of the McCormack's business, he was in actuality acting only for himself, doing business as "Financial Services Limited." What he did was clearly outside the scope of any agency relation he had with FSC Securities.
What conduct of FSC Securities clothed him with any apparent authority to do what he did? FSC Securities did not solicit the McCormack's business. Indeed, Manuel did not either. There was no correspondence on an FSC Securities letterhead. At no time in their dealings with Manuel were the parties in FSC Securities' offices. The McCormacks made no inquiry of FSC Securities about Manuel or his authority to represent them. The McCormacks did not make the $150,000 check payable to FSC Securities, but instead to Manuel's firm. Indeed, had they read the instructions from Continental Trust Company which constituted part of the basis of their claim of apparent authority in Manuel, they would have learned any check for an investment should have been made payable to Continental Trust Company.
One need have no sympathy for FSC Securities, which I do not, to reach the conclusion there is no liability here. Had any of the above-mentioned factors been the other way around, a very different result might be warranted.
True, Manuel was a representative of FSC Securities and an agent of sorts, which carried with it the baggage of some apparent authority as well. Perhaps there are some things he did have the apparent authority to do on FSC Securities' behalf. But nothing about FSC Securities' conduct should have led the McCormacks or anybody else to believe Manuel had any authority whatever to take a check for $150,000 solely in his own firm's name and thereby bind FSC Securities just as though the check had been payable to it. Cover, supra; Badger, supra; Restatement (Second) Agency § 27 and Cmt. a at 103-104 (1958).
As initially stated, because we reverse and render, I see no necessity to address the punitive damage question.
NOTES
[1] Manuel's dealings with these enterprises have been before this Court. See Gibson v. Manuel, 534 So.2d 199 (Miss. 1988), wherein it was held that a corporate officer and controlling shareholder has a duty to a pledgee not to "loot" the corporate assets.
[2] In 1987, the IRS ruled that the Bolivar-Boyle Limited Partnership in which the McCormacks had invested was not a valid tax shelter. They lost the investment as well as the hoped-for tax benefits. To their further dismay, the McCormacks also learned that Bolivar-Boyle was put together by Manuel.
[3] The IRS requires that funds received from a pension and profit sharing plan must be deposited in an IRA Rollover account within 60 days of receipt. If there are several distributions within a single tax year, the 60-day period does not begin to run until the last distribution is received. [1992] 5 Stan.Fed.Tax.Rep. (CCH) § 18,922.089.
[1] This investment later went sour, and the tax benefit sought by the McCormacks was disallowed.