# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00732-COA

**HOLLY S. MORGAN**                                               **APPELLANT**

**v.**

**MML INVESTORS SERVICES, INC.,**                     **APPELLEES**
**MASSACHUSETTS MUTUAL LIFE**
**INSURANCE COMPANY AND STEPHEN**
**COLLINS, INDIVIDUALLY AND D/B/A**
**COLLINS FINANCIAL NETWORK**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/19/2016 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | ROBERT G. GERMANY |
| | CRYMES G. PITTMAN |
| ATTORNEYS FOR APPELLEES: | ROY H. LIDDELL |
| | TREY C. DELLINGER |
| | REBECCA B. COWAN |
| | WHITMAN B. JOHNSON III |
| | BEN C. LEWIS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/29/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., WILSON AND WESTBROOKS, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Ralph "Skip" Moore was a registered representative of Massachusetts Mutual Life

Insurance Company (MassMutual) and a unit sales manager for Collins Financial Network

(CFN).  Holly Morgan had known Moore for twenty-five years.  In February 2009, Morgan

gave Moore $20,000 in cash.  She says the cash was for an unspecified "investment" and that

Moore promised an eighteen to twenty-five percent return in only six months. However, Moore says that Morgan asked him to hold the cash for her as a favor and later told him to bet it on the Super Bowl. He says that he eventually lost all the money on bets on the Super Bowl and basketball games. In February 2009, Morgan also gave Moore a check for $75,000. The payee line was blank, and Moore filled in his name. Morgan says these funds were for another unspecified "investment" and that Moore promised a return of eighteen to twenty-five percent in twelve to eighteen months. However, Moore says that the funds were for a loan to a friend of his. The friend was unable to repay the loan.

¶2.     Morgan sued Moore, MassMutual and one of its subsidiaries, and Stephen Collins, individually and d/b/a CFN, in circuit court. Morgan eventually narrowed her complaint to claims for breach of contract and conversion. She argued that MassMutual and Collins were liable because they clothed Moore with "apparent authority" to enter into the alleged investment contracts and to accept funds for the alleged investments. She also argued that Collins was liable because Moore was CFN's employee. On motions for summary judgment, the circuit court ruled that there were no genuine issues of material fact and that neither MassMutual nor Collins was liable for Moore's alleged actions under a theory of apparent authority or otherwise. The court granted summary judgment for both and certified its rulings as final pursuant to Mississippi Rule of Civil Procedure 54(b),[1] and Morgan filed a timely notice of appeal. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

---

[1] Morgan's claims against Moore remain pending and are not at issue in this appeal.

2

¶3.    Morgan and Moore have been casual acquaintances for over twenty-five years.  In January 2009, they crossed paths at Tico's Steak House in Ridgeland.  They spoke briefly, and Morgan gave Moore her telephone number.  He soon called her, and they made plans to meet for lunch at Nick's Restaurant in Jackson.

¶4.    Morgan and Moore discussed his position as unit sales manager for CFN[2] and a registered representative of MassMutual.  Morgan expressed interest in purchasing a life insurance policy from Moore, and on February 17, 2009, Morgan completed and signed an application for life insurance with MassMutual at Moore's office.  However, Morgan ultimately decided to abandon the application.  Morgan never submitted any payment in connection with this application and did not expect MassMutual to issue a policy to her.

¶5.    In February 2009, Morgan gave Moore two large sums of money.  In early February, she gave him $20,000 in cash.  Morgan says that the cash was for an "investment."  She alleges that Moore promised that she would be repaid the principal plus eighteen to twenty-five percent interest in only six months.  According to Moore, there was no further discussion of the nature of the "investment," and she never received or requested any documentation concerning the investment.  Morgan was unsure whether she gave Moore the cash at Nick's or at his office.

¶6.    On February 17, 2009, Morgan gave Moore a check for $75,000.  Morgan says that this money was also for an unspecified "investment."  She alleges that Moore promised that she would be repaid the principal plus eighteen to twenty-five percent interest in twelve to

_____

[2] Stephen Collins is a general agent for MassMutual.  CFN is his business name.

3

eighteen months. Once again, according to Morgan, there was no further discussion of the nature of the "investment," and she never received or requested any documentation of it. Morgan says that she gave Moore the check in his office and that she left the payee line blank because Moore said he would "stamp" it for her. When Morgan received her bank statement, she noticed that Moore had written in his name as the payee, but this did not concern her.

¶7.    Moore's version of events is significantly different. He claims that after he and Morgan reconnected at Tico's, they began a romantic relationship. He denies that he provided Morgan any financial services other than accepting her application for a life insurance policy, which she ultimately decided against. Moore claims that Morgan gave him the $20,000 cash to hold while she was on vacation in Cabo San Lucas, Mexico. Moore claims that Morgan gave him the cash at Nick's and that this was not the only time that she asked him to hold a large sum of cash for her. Moore says that after Morgan returned from Mexico, he tried to return the money to her multiple times, but she told him to continue holding it. According to Moore, Morgan eventually told him to bet the money on the Super Bowl. He lost $10,000 on the Super Bowl[3] and then lost the rest of the money on basketball games. Moore placed the bets with a short man he knew only as "Ben." Moore would meet Ben in the parking lot at Northpark Mall to transact business.

¶8.    Moore claims that Morgan's $75,000 check was for a loan to his friend Ray Winstead and that Morgan knew about the loan when she wrote the check. Winstead needed the money because he "was involved in several different businesses," and "things were fixing

---

[3] He bet on the Pittsburgh Steelers, but they did not cover the spread.

to be really good" for him, but "he was in a cash flow bind" at the time. Winstead promised to repay the loan in a year with eight percent interest "no matter what," but if things went well, he might pay Morgan "double" that amount. Moore says that Morgan gave him the check while at Nick's. He deposited the funds in his personal account and then obtained a cashier's check for Winstead. Moore never told MassMutual or Collins about the cash or check from Morgan because he did not believe that either was related to his work.

¶9. Morgan acknowledges that Moore never told her that her money was invested with or through MassMutual or CFN. In fact, Morgan says that she and Moore never discussed anything about the nature of the alleged investments—other than the returns that Moore allegedly promised. Morgan also acknowledges that she never received a receipt, contract, statement, or any other documentation from MassMutual or CFN. She "just assumed [that each investment] had to be an investment with MassMutual." To justify this assumption, Morgan emphasizes that she met with Moore in his office at CFN's office on Leila Drive in Jackson, which is identified as a "Supervisory Office" of MassMutual. She also emphasizes that Moore gave her a business card that identified him as a "Unit Sales Manager" for CFN and a "registered representative" of MassMutual, with authority to "offer[] securities through MML Investor Services, Inc., a MassMutual subsidiary." The card also prominently displayed MassMutual's logo.

¶10. In January 2010, Morgan sent Moore a text message demanding to know when she would receive her "first payment," apparently a reference to the $20,000 investment.[4] In

_____

[4] Moore says that he and Morgan had a falling out in March 2009, when Morgan saw him kissing another woman in a parking lot outside of Reed Pierce's, a restaurant in Byram.

response, Moore acknowledged that the "smaller payment" (the $20,000) "obviously [had] not gone well," but he told Morgan that he expected a payment in May, by which he meant a payment from Winstead on the $75,000 loan. However, Winstead never made any payments on the loan, and Moore never made any payments to Morgan. According to Moore, Winstead was unable to repay the loan because of unrelated litigation. Morgan never contacted MassMutual or CFN regarding her alleged investments.

¶11. On January 4, 2011, Morgan filed suit against Moore, MassMutual, and Collins, individually and doing business as CFN, in Hinds County Circuit Court. She asserted claims for breach of contract, conversion, negligence, and alleged violations of the Mississippi Securities Act. Following discovery, MassMutual filed a motion for summary judgment in July 2015, and Collins filed a motion for summary judgment in September 2015. In response, Morgan abandoned her claims for negligence and for alleged violations of the Securities Act. However, Morgan argued that Moore had apparent authority to act for MassMutual and Collins and that both were liable for breach of contract and conversion as a result of Moore's actions. She also argued that Collins was liable because Moore was acting as CFN's employee rather than as an independent contractor.

¶12. The circuit court concluded that there was no genuine issue of material fact because neither MassMutual nor Collins knew of or authorized the alleged transactions or "did or said

Moore claims that Morgan became angry and demanded immediate reimbursement for a plane ticket that she had purchased for him for an upcoming trip to Cabo San Lucas. Morgan denies that any such incident occurred. She agrees that she bought the plane ticket and that Moore repaid her for it. However, she says that she invited Moore on the trip to discuss investments with her friends, not because they were romantically involved, and that the trip was cancelled for unrelated reasons.

anything to Ms. Morgan to clothe Mr. Moore with apparent authority to bind [MassMutual or Collins] regarding these transactions." Accordingly, the court granted summary judgment for both MassMutual and Collins and certified its rulings as final pursuant to Mississippi Rule of Civil Procedure 54(b). Morgan filed a timely notice of appeal. Her claims against Moore remain pending in the circuit court and are not at issue in this appeal.

## ANALYSIS

¶13. On appeal, Morgan argues that the circuit court erred by granting summary judgment in favor of MassMutual and Collins. She argues that genuine issues of material fact preclude summary judgment on her claims for breach of contract and conversion. She further argues that there are genuine issues of material fact as to whether MassMutual and Collins clothed Moore with apparent authority to bind them with regard to the alleged transactions. She also argues that there is a genuine issue of material fact as to whether Collins is liable because Moore was acting as CFN's "employee" rather than a mere independent contractor.

¶14. We review the circuit court's order granting summary judgment de novo. *Thomas v. Chevron U.S.A. Inc.*, 212 So. 3d 58, 60 (¶7) (Miss. 2017). Summary "judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "The focal point of our standard for summary judgment is on *material* facts," which means those facts "*that matter[] in an outcome determinative sense*." *Simmons v. Thompson Mach. of Miss. Inc.*, 631 So. 2d 798, 801 (Miss. 1994). "The existence of a

7

hundred contested issues of fact will not thwart summary judgment where there is no genuine dispute regarding the material issues of fact." *Sanders v. Advanced Neuromodulation Sys. Inc.*, 44 So. 3d 960, 965 (¶11) (Miss. 2010) (quoting *Moss v. Batesville Casket Co.*, 935 So. 2d 393, 399 (¶17) (Miss. 2006)); *see also Summers ex rel. Dawson v. St. Andrew's Episcopal Sch. Inc.*, 759 So. 2d 1203, 1208 (¶12) (Miss. 2000) ("Numerous, immaterial facts may be controverted, but only those that affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." (quotation marks omitted)).

¶15. We view the evidence in the light most favorable to the nonmoving party. *Thomas*, 212 So. 3d at 60 (¶7). However, the nonmoving "party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e). A party is entitled to summary judgment if the evidence before the court demonstrates that there is no genuine issue of material fact and the party moving for summary judgment is entitled to judgment as a matter of law. M.R.C.P. 56(c).

¶16. We begin by briefly addressing Morgan's argument that Collins is liable for Moore's actions because Moore was an "employee" of CFN rather than a mere agent or independent contractor. Although Morgan argues that Moore was CFN's "employee," she does not explain how an employment relationship, standing alone, would render Collins liable for Moore's alleged misconduct. At oral argument, counsel for Morgan agreed that this was in substance a "respondeat superior" claim and also conceded that there is no evidence that Moore's actions benefitted CFN or served CFN's purposes. Where an employee acts for a

purpose of his own and not in service of his employer's interest, the employer cannot be held liable under the doctrine of respondeat superior. *See Akins v. Golden Triangle Planning & Dev. Dist. Inc.*, 34 So. 3d 575, 579-81 (¶¶10-21) (Miss. 2010). Therefore, even if Morgan was CFN's "employee,"[5] that status, standing alone, would not provide a basis for imposing liability on Collins. Accordingly, this issue requires no further discussion.

¶17. We now address the primary issue in this appeal: apparent authority. "In order to recover under a theory of apparent authority, the claimant must put forth 'sufficient evidence' of '(1) acts or conduct of the *principal* indicating the agent's authority, (2) reasonable reliance upon those acts by [the claimant], and (3) a detrimental change in position by [the claimant] as a result of that reliance.'" *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1160 (¶14) (Miss. 2010) (quoting *Eaton v. Porter*, 645 So. 2d 1323, 1325 (Miss. 1994)). Our Supreme Court has explained that

> [a]n act is considered to be within the agent's apparent authority when a third party is justified in concluding that the agent is authorized to perform it from the nature of the duties which are entrusted to him. Apparent authority is to be determined from the acts of the principal and requires reliance and good faith on the part of the third party.

*FSC Securities Corp. v. McCormack*, 630 So. 2d 979, 985 (Miss. 1994) (citations omitted) (quoting *Terrain Enters. Inc. v. W. Cas. & Sur. Co.*, 774 F.2d 1320, 1322 (5th Cir. 1985)). The Court has also held that an agent's apparent authority is that authority which, in light of the principal's conduct, "persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have." *Eaton*, 645 So.

---

[5] Collins maintains that Moore was an independent contractor, not an employee.

9

2d at 1325 (quoting *Steen v. Andrews*, 223 Miss. 694, 697-698, 78 So. 2d 881, 883 (1955)).

If there is sufficient evidence as to each of the three elements of apparent authority, the issue

"is a question of fact to be determined . . . by the jury." *Id.* However, "if evidence on any

of the three elements is missing, summary judgment is appropriate." *Hutton v. Am. Gen. Life*

*& Accident Ins.*, 909 So. 2d 87, 94 (¶21) (Miss. Ct. App. 2005).

¶18.     In *FSC Securities*, *supra*, our Supreme Court discussed the concept of apparent

authority in a somewhat similar context. There, the McCormacks sued FSC Securities (FSC)

after FSC's "registered representative," Donald Manuel, allegedly misappropriated funds that

they had entrusted to him. *FSC Secs.*, 630 So. 2d at 982-85. The McCormacks testified that

they instructed Manuel to invest the funds in bonds and a money market account, but Manuel

used the money for "bridge loans" to his radio stations and personal purposes. *Id.* at 984-85.

The McCormacks testified that Manuel held himself out as a representative of FSC. *Id.* at

983-84. He gave them a business card that identified him as such, as well as an IRA

brochure from FSC. *Id.* He also wrote them a letter on stationary that referenced FSC. *Id.*

However, the McCormacks had no contact with anyone else affiliated with FSC, and they

did not contact FSC when they began to worry about their money. *Id.* The McCormacks also

testified that they did not notice that Manuel's business card and stationary identified him as

president of a company called "Financial Services Limited," nor did they read the

information that he provided to them about their investment. *Id.* Finally, the McCormacks

made payment to, and received a receipt from, Financial Services Limited, not FSC. *Id.* at

982-83, 986. On these facts, the Supreme Court held that the McCormacks "had notice" that

10

Manuel was not acting for FSC, that their reliance on Manuel's alleged apparent authority was unreasonable, and that FSC could not be held vicariously liable for Manuel's actions. *See id.* at 986.

¶19. The lead opinion in *FSC Securities* was a plurality opinion. Chief Justice Hawkins, specially concurring, also concluded that FSC did nothing to clothe Manuel with apparent authority. *See id.* at 990-91 (Hawkins, C.J., specially concurring). Chief Justice Hawkins acknowledged that Manuel "was a representative of FSC Securities and an agent of sorts" and perhaps had apparent authority to do "some things" on its behalf. *Id.* at 991. However, FSC did nothing to create the impression that Manuel had "any authority whatever to take a check for $150,000 solely in his own firm's name and thereby bind FSC Securities just as though the check had been payable to it." *Id.*

¶20. Morgan contends that the facts of the present case are more analogous to *Eaton v. Porter*, *supra*, where our Supreme Court affirmed the county court's imposition of vicarious liability based on apparent authority. In that case, the Porters went to Eaton Motors, where they met J.W. Eaton Sr. and discussed repairs to their car, which had been in a collision. *Eaton*, 645 So. 2d at 1324. Eaton Sr. "agreed to have the car fixed," "made arrangements for the car to be moved to Eaton Motors from [another shop] where it had been towed," and gave the Porters his Eaton Motors business card. *Id.* Eaton Sr. also signed the estimate and endorsed the check from the Porters' insurer on behalf of Eaton Motors. *Id.* However, Eaton Sr. actually arranged for another body shop to perform the work. *Id.* According to the Porters, he did so without their knowledge. *Id.* When the Porters discovered that the repair

11

work was defective, they sued Eaton Motors. Eaton Motors argued that it neither performed the work nor "held itself out to the public as a repair business," and therefore Eaton Sr. lacked authority to contract for repair work on its behalf. *Id.* at 1324-26.

¶21. The Supreme Court rejected Eaton Motors's argument and held that Eaton Motors clothed Eaton Sr. with apparent authority to agree to perform the work by providing him a desk on the premises, business cards, and authority to endorse checks. *See id.* at 1326-27. The Court also held that the Porters' perceptions of Eaton Sr.'s authority and their reliance thereon were reasonable. The Court reasoned that there was no reason that the Porters, who were not from the area, should have known that "Eaton Motors" did not perform repair work on cars other than the cars that it offered for sale. *See id.*

¶22. To determine whether Moore had apparent authority for purposes of this case, it is first necessary to define precisely *what* it is that Morgan alleges that Moore had apparent authority to do on behalf of MassMutual and CFN. As Chief Justice Hawkins reasoned in *FSC Securities*, Moore undoubtedly was a representative of both entities "and an agent of sorts," and he obviously had apparent authority to do "some things" on their behalf. *See FSC Secs.*, 630 So. 2d at 991 (Hawkins, C.J., specially concurring). As in *Eaton v. Porter*, Moore's business card, office, and titles with both entities clothed him with some degree of apparent authority. Morgan relies heavily on Moore's business card, which showed Moore to be a unit sales manager for CFN and a registered representative of MassMutual. The card also included a MassMutual logo and represented that Moore "offer[ed] securities through MML Investor Services, Inc., a MassMutual subsidiary." Consistent with *Eaton v. Porter*,

12

these circumstances certainly were sufficient to clothe Moore with apparent authority to engage in such transactions on behalf of MassMutual and CFN.[6]

¶23. However, the issue in this case is whether Moore had apparent authority to bind MassMutual and CFN to alleged "investment" contracts of a materially different type. Taking all of Morgan's testimony and evidence as true and granting her all favorable inferences, the evidence supports, at best, the following version of events: Morgan gave Moore $20,000 in cash and then a $75,000 check payable to Moore.[7] Morgan says that the money was for unspecified "investments," but she never received a contract, an account statement, or any other documentation from either MassMutual or CFN. Morgan was never contacted by—and never contacted—any other person affiliated with either entity. She says that she never requested or received any information whatsoever concerning the nature of her investments. Morgan maintains that she gave Moore the money based on his promises of eighteen to twenty-five percent returns in only six months in one case and in twelve to eighteen months in the other case. She acknowledges that Moore never stated that these investments were with or through MassMutual or CFN. In her own words, Morgan "just assumed" that the investments were with MassMutual. Consistent with Morgan's claims and deposition testimony, the alleged "contracts" were described at oral argument in this Court

---

[6] MassMutual and CFN rely heavily on their contracts with Moore, which place various restrictions and limitations on his authority. However, these contracts were not available to Morgan or any other member of the public. Thus, although the contracts are highly relevant to any issue of Moore's *actual* authority, their relevance to the issue of his apparent authority is far from clear, and our opinion does not rely or depend on them.

[7] As discussed above, Morgan left the payee line blank, but she was unconcerned when she saw that Moore had made it payable to himself.

as agreements to pay eighteen to twenty-five percent interest, guaranteed, within the time periods specified as returns on "investments" of an entirely unknown nature.

¶24.    On these facts, even granting Morgan the benefit of all favorable inferences, the circuit court properly determined that there was no genuine issue of material fact and that MassMutual and Collins were entitled to judgment as a matter of law.  The test of apparent authority is whether "the conduct of the principal is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he assumes to have." *Eaton*, 645 So. 2d at 1325 (quoting *Steen*, 223 Miss. at 697-98, 78 So. 2d at 883).  MassMutual and/or Collins provided Moore with an office, business cards, and titles, but none of those things provides a basis for "persons of reasonable prudence, ordinarily familiar with business practices," to assume that Moore had authority to bind MassMutual or Collins to the vague and highly unusual "investment" contracts described by Moore.  Nor did MassMutual or Collins do anything to clothe Moore with apparent authority to accept cash or checks that were not made payable to either of them. *See FSC Secs.*, 630 So. 2d at 986; *id.* at 991 (Hawkins, C.J., specially concurring).[8]

¶25.    Stated slightly differently, Morgan's alleged reliance on her own assumption that Moore had the authority to enter into the alleged investment contracts on behalf of MassMutual and Collins was not *reasonable* reliance.  Morgan did not pay the funds to MassMutual or Collins, and she never received any receipt, contract, statement, or other

---

[8] In contrast, in *Eaton v. Porter*, the check was endorsed to the principal, Eaton Motors, and there was nothing unusual about the repair work that the agent agreed to have performed. *Eaton*, 645 So. 2d at 1324.

14

documentation from them. Morgan acknowledges that Moore never even said that the investments would be with or through MassMutual or CFN. Morgan argues that her alleged reliance was reasonable because she had known Moore personally for a number of years. While that fact might be relevant to her claims against Moore, it has nothing to do with the objective reasonableness of her unilateral assumptions about Moore's authority and her investments. Morgan's assumption that Moore was acting on behalf of MassMutual and CFN was not reasonable given that, among other things, she never paid money to MassMutual or Collins and never received any receipt, contract, or statement indicating that either entity had received the funds. *See FSC Secs.*, 630 So. 2d at 986; *id.* at 991 (Hawkins, C.J., specially concurring).

¶26. In summary, the circuit court correctly concluded that there were no genuine issues of material fact as to whether Moore had "apparent authority" to act on behalf of MassMutual or Collins/CFN with respect to the alleged "investments." On the undisputed material facts, MassMutual and Collins, individually and doing business as CFN, were entitled to judgment as a matter of law.

¶27. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR.**