**MULTI–FAMILY MANAGEMENT, INC., Appellant/Cross–Appellee,**

v.

**Robert HANCOCK, Appellee/Cross–Appellant.**

**Nos. 93–CV–346, 93–CV–383.**

District of Columbia Court of Appeals.

Argued June 21, 1994.
Decided Aug. 31, 1995.

Sheldon P. Schuman, Bethesda, MD, for appellant.

David A. Wanger, Supervising Attorney, with whom Michael A. Delaney, Law Student Counsel, and Ann Marie Hay, Executive Director, D.C. Law Students in Court, Washington, DC, were on the brief, for appellee.

Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Michael Jay Singer and Jeffrey Clair, Attorneys, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, submitted a brief for the United States as amicus curiae.

Before FERREN, STEADMAN, and FARRELL, Associate Judges.

Judgment Per Curiam.

Opinion concurring in part and dissenting in part by Associate Judge FERREN at p. 1211.

Separate opinion by Associate Judge STEADMAN at p. 1224.

Separate opinion by Associate Judge FARRELL at p. 1225.

PER CURIAM:

Pursuant to Parts I., II., and III.B. of the opinion of Judge FERREN, joined in this regard by Judge STEADMAN, the order appealed from is reversed insofar as it orders payment by plaintiff to the Department of Housing and Urban Development. Pursuant to the opinion of Judge STEADMAN, joined in this regard by Judge FARRELL, the case is remanded for further proceedings consistent therewith.

FERREN, Associate Judge, concurring in part and dissenting in part:

This case began when the landlord, Multi-Family Management Inc., sued the tenant, Robert Hancock, for possession of Hancock's apartment based on failure to pay rent. The trial court entered a protective order requiring Hancock to pay his rent into the court registry each month "during the pendency of this case." Hancock filed an answer and counterclaim, alleging housing code violations in the apartment and in common areas of the building. The trial judge found there were code violations and accordingly ordered rent abatements. Pursuant to a Housing Assistance Payments (HAP) contract[1] between the United States Department of Housing and Urban Development (HUD) and the landlord, however, HUD in effect paid the

1. Under this standard contract, HUD agrees to pay a tenant subsidy to the landlord in order to give lower-income families a greater opportunity for decent, safe, and sanitary housing. A tenant is thus assigned a certain amount of rent to pay, based on a percentage of his or her income. The fair rental value of the apartment is then ascertained and HUD pays the difference between this value and the rent paid by the tenant. HUD and

Multi-Family entered into this HAP contract effective October 1, 1984, pursuant to the Section 8 low income housing assistance program, enacted as part of the Housing and Community Development Act of 1974, Pub.L. 93-383, 88 Stat. 633. Section 8 is codified in scattered sections of Titles 5, 12, 20, 31, 42, and 49 of the United States Code. The particular statute at issue in this case is 42 U.S.C. § 1437f (1976).

bulk of the apartment rentals this private landlord received. In recognition of this dual payment regime, the trial court divided the rent abatements between the tenant and HUD, apportioning to each the percentage representing the portion of the rent each had paid for the unit. The court then ordered the landlord to pay these respective amounts to the tenant and to HUD, even though HUD was never a party to the litigation. Both parties now appeal.[2]

Hancock, the tenant, claims the right to 100% of the abatements, on two alternative grounds: *First,* as the beneficiary of a lease that provides the tenant with a substantial bargain—*i.e.,* a $560/month apartment for his $168/month rental—the tenant is entitled to benefit from that bargain by receiving rent abatements based on the apartment's full ($560) rental value, not on the lesser value ($168) of the rent he actually paid. *See Cruz Management Co. v. Wideman,* 417 Mass. 771, 633 N.E.2d 384 (1994). *Second,* as a third party beneficiary of the landlord's HAP contract with HUD—*i.e.,* as the recipient of a HUD rental subsidy—the tenant is entitled not only to the portion of each abatement attributable to his own rental payment but also to the balance representing the subsidy paid by HUD, because HUD, in executing the HAP contract, had effectively transferred, and thus released, for the benefit of the tenant HUD's original interest in the subsidy funds. *See, e.g., Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir.1981).

Multi–Family, the landlord, also appeals. It supports the trial court's ruling that the tenant, at most, can claim for himself abatements based on the portion of the total rent he paid, not on the total amount paid for the apartment (including HUD's contributions under the HAP contract). But the landlord contends the trial court erred in ordering the landlord to pay a portion of the abatements to HUD since HUD is not a party. Thus, the landlord maintains that it should retain a portion of the abatement funds that would be awardable in full to the tenant if the apartment had been rented on the open market, not under a federal subsidy program.[3]

Focusing first on a threshold jurisdictional issue, I conclude in the opinion that follows that HUD is not an indispensable party. Next, it would appear—at least to this judge—that, because HUD was not a party, the trial court had no authority to award HUD a portion of the abatements (the total amount of which is unchallenged). But even if the court had such authority, the court should not have made that award because it is not at all clear that HUD had a legal claim to any portion of the rent abatements. Finally, as between tenant and landlord, I conclude that the terms of the lease and persuasive case law favor awarding the tenant 100% of the abatements attributable to the deteriorated condition of his apartment, rather than leaving with the landlord the portion of the abatement funds attributable to HUD's subsidy or remanding for further proceedings (as Judge Steadman would do). Perhaps HUD can recover from the tenant the portion of the abatements representing its subsidy, although there is persuasive authority that the tenant is a third party beneficiary of the HAP contract, leaving HUD without a claim; but even if HUD retains an equity vis-a-vis the tenant, that equity does not extend to the landlord, who does not challenge the appropriateness or the amounts of the rent abatements. See *supra* note 3. Nor can the landlord claim any equity in the abatements by citing a possibility of double recovery by the tenant and HUD in separate litigation against the landlord (based, respectively, on the common law and on the HAP contract). That possibility is probably foreclosed in this case because it appears that HUD has waived its right to rent abatements under its HAP contract with the landlord by failing to give a notice to cure. But even if HUD can still proceed separately against the landlord for violation of the HAP contract, the landlord probably would be able to protect itself

---

2. After oral argument, we invited the United States Department of Justice, on behalf of HUD, to file a brief as *amicus curiae* to inform the court of HUD'S views on the various questions presented. Multi–Family and Hancock then filed responses.

3. Multi–Family does not claim that any of the abatements for code violations is unjustified, nor does it dispute the percentage or dollar amount the trial judge awarded as to each violation.

against double recovery by impleading the tenant in any action HUD eventually brings and arguing that HUD's recovery, if any, must come from the tenant on an unjust enrichment theory. Accordingly, I would reverse and remand.

## I. FACTS AND PROCEEDINGS

When Multi–Family sued its tenant, Hancock, on December 11, 1991, for possession of the apartment based on alleged non-payment of rent, Hancock defended and counterclaimed on the ground that the apartment and common areas had housing code violations amounting to breaches of the implied warranty of habitability, to wit: drug addicts and transients continuously loitered, slept, littered, and urinated in the common areas of the complex; Hancock's oven had been broken since he first moved in; water continuously ran from the faucets in the kitchen and in the bedroom; and certain windows in the apartment would not open while others would not stay open by themselves.

The trial court found numerous violations both in the apartment and in the common areas. The court therefore concluded that various rent abatements were required based on percentage diminutions of the "reasonable rental value of the leased premises."[4] Com-

plications arose, however, because of the fact that Hancock was paying only a percentage of the total rent for the apartment; HUD, in effect, was paying the rest under a 1984 HAP contract with Multi–Family. See *supra* note 1. The trial court, therefore, postponed its final ruling, requesting the parties to submit additional memoranda discussing who should be entitled to the abatements.

After receiving the memoranda, the trial court ruled as follows in a written Memorandum–Order:

> Neither party has submitted any dispositive case law, federal regulation, or federal statute on the issue presented. This Court concludes that the only fair and equitable result which will protect the interests of all concerned (i.e., the tenant, the landlord, and the United States taxpayers who are subsidizing the rental of this apartment) is [1] to apply the percentage abatements to the actual rent being paid by the Defendant Mr. Hancock, and [2] to require the Plaintiff Multi–Family Management to refund to the Department of Housing and Urban Development the percentage abatements of the subsidy it receives from the Section 8 Program.

4. The trial court determined "reasonable rental value" by reference to the combined monthly payments by the tenant and by HUD—*i.e.*, in effect by reference to the total monthly contract rent. *See Housing Auth. of E. St. Louis v. Melvin*, 154 Ill.App.3d 999, 107 Ill.Dec. 920, 925, 507 N.E.2d 1289, 1294 (1987) ("agreed rent may be considered by the court as evidence of the fair rental value"). The court then calculated each abatement by determining what percentage reduction of the reasonable rental value was attributable to code violations for a particular time period, and then multiplying the reasonable rental value by that percentage. No party questions the trial court's methodology. This court has never squarely addressed the question of how to determine the amount of a rent abatement when

the landlord has breached the implied warranty of habitability. For purposes of this appeal, we accept the trial court's unchallenged approach. *See generally* RESTATEMENT (SECOND) OF PROPERTY § 11.1 reporter's note (1976) (citing four possible approaches to calculation of rent abatements).

Because the existence and severity of the problems with the apartment varied over the period in question, the court awarded different percentage abatements for each of five blocks of time that Hancock rented the apartment. The following chart indicates how much rent Hancock, himself, paid during each time period; what percentage of the rent the judge awarded as an abatement for each period; the dollar amounts of Hancock's monthly abatements; and Hancock's total abatement for each period.

| DATES | TENANT RENT | ABATEMENT PERCENTAGE | MONTHLY ABATEMENT | TOTAL ABATEMENT |
|---|---|---|---|---|
| 3/89–5/90 | $151 | 25% | $37.75 | $ 566.25 |
| 6/90–5/91 | $159 | 25% | $39.75 | $ 477.00 |
| 6/91–1/92 | $168 | 25% | $42.00 | $ 336.00 |
| 2/92–3/92 | $168 | 10% | $16.80 | $ 33.60 |
| 4/92–6/92 | $168 | 17% | $11.76 | $ 35.28 |
| | | | TOTAL: | $1,448.13 |

The court ordered the landlord to pay HUD a total abatement of $2,770.22.

Although the trial court did not refer to either of the two contracts involved here (*i.e.,* the lease between landlord and tenant and the HAP contract between landlord and HUD), the terms of these contracts play an important role in analysis of the case.

Several provisions of the lease between Hancock and Multi–Family recognize HUD's payments allocable to Hancock's apartment.[5] The lease also includes provisions prohibiting the landlord from changing any term of the lease without following the administrative procedures set forth in HUD's handbooks. It further requires the landlord to maintain the common areas of the complex in a clean, safe condition, to keep appliances in working order, and to make necessary repairs promptly. Pursuant to the terms of this lease agreement, Hancock paid from $151 to $168 per month as his rent. See *supra* note 4.

Under the separate HAP contract between HUD and Multi–Family (to which Hancock is not a party), see *supra* note 1, HUD paid the landlord the difference between the amount the tenant paid and the fair market value of the apartment, which over the years changed from $425 to $560.[6] HUD's monthly subsidy to Multi–Family therefore ranged from $274 ($425–$151) to $409 ($560–$151), leveling off at $392 ($560–$168) since mid–1991. See *supra* note 4.

The HAP contract obligates the landlord to "maintain and operate the contract units and related facilities so as to provide decent, safe and sanitary housing as defined by HUD." The contract also includes a provision obligating HUD to pay 80% of the contract rent for the apartment for up to 60 days after the apartment should become vacant and specifies that "HUD does not assume any obligation for the amount of rent payable by any family or for the satisfaction of any claim by the Owner against the family...."[7]

The HAP contract also addresses HUD's potential remedies. If the landlord (owner) breaches the contract and, after a notice to cure from HUD, fails to make all necessary repairs, HUD may terminate the contract or take possession of the project until the owner is "in a position to operate the project in accordance with the terms of this Contract...." HUD then has the right to collect rent and pay the owner's obligations. HUD also may sue the owner for specific performance, for injunctive relief, for the appointment of a receiver to take over and operate the project, "or for such other relief as may be appropriate."

Nowhere does the HAP contract specifically state that HUD is paying "rent" for the tenants, or that HUD's payments are "on behalf of" the tenants, although this is clearly the practical effect of the agreement.

## II. INDISPENSABLE PARTY ISSUE

 Given HUD's role in this particular landlord-tenant relationship under its HAP contract with the landlord, the first question is whether HUD (or, more accurately, the United States) is an indispensable party un-

---

5. These lease provisions are:

> 3. ... The Tenant understands that this monthly rent is less than the market (unsubsidized) rent due on this unit. The lower rent is available either because the mortgage on this project is subsidized by [HUD] and/or *because HUD makes monthly payments to the Landlord on behalf of the Tenant....*
> 17(a). ... The Tenant understands that assistance made available on his/her behalf may be terminated if any of the following events happen. Termination of assistance means that the Landlord may make the assistance available to another Tenant and the Tenant's rent will be recomputed....
> 17(c). ... Termination of assistance shall not affect the Tenant's other rights under this

> Agreement, including the right to occupy the unit....

(Emphasis added.) The italicized clause describes the subsidy arrangement in this case.

6. Although the HAP contract was not initially part of the trial record, Multi–Family submitted it to the trial court when asked for post-trial memoranda.

7. The HAP contract further obligates the landlord to "pay monthly to the family the amount of the Net Family Contribution when the Net Family Contribution is negative." In other words, in some circumstances the HUD-financed landlord actually may have to make cash contributions to a tenant whose financial circumstances are so poor as to require a subsidy beyond a fully subsidized apartment.

der Super.Ct.Civ.R. 19(a)—a threshold jurisdictional issue raised by Multi–Family for the first time on appeal: [8]

Rule 19(a) provides:

(a) *Persons to be joined if feasible.* A person who is subject to service of process and whose joinder will not deprive the Court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the Court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. . . .

*See Flack v. Laster,* 417 A.2d 393, 399–400 (D.C.1980) (noting that if indispensable party cannot be joined under Rule 19(a), action must be dismissed).

No one claims that HUD's joinder is required to afford "complete relief" as between landlord and tenant. Super.Ct.Civ.R. 19(a)(1). The Rule 19 issue begins with Super.Ct.Civ.R. 19(a)(2) and initially concerns HUD, which certainly has "an interest relating to the subject of the action," *id.,* namely a potential claim against the landlord for an abatement of HUD's financial contribution for the tenant's apartment. Putting aside the question whether HUD actually "claims"

that interest within the meaning of Rule 19(a)(2),[9] we note, first, that HUD's absence from this lawsuit will not "impair or impede," Super.Ct.Civ.R. 19(a)(2)(i), HUD's ability to protect its interest. HUD can enforce its own rights against the landlord under the HAP contract, see *supra* note 1, and no judgment in this case, to which HUD is not a party, can have a preclusive effect on those contract rights. *See generally Smith v. Jenkins,* 562 A.2d 610, 617 (D.C.1989); *Rhema Christian Ctr. v. Board of Zoning Adjustment,* 515 A.2d 189, 192–93 (D.C.1986); *Henderson v. Snider Bros.,* 439 A.2d 481, 484–85 (D.C.1981) (en banc); RESTATEMENT, (SECOND), JUDGMENTS § 34(3) (1982).

There is, finally, the question under Super.Ct.Civ.R. 19(a)(2)(ii) of the impact on the landlord: [10] whether HUD's absence from the lawsuit will leave Multi–Family "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of [HUD's] claimed interest." The answer is "no." Focusing first on potentially "inconsistent obligations," *id.,* amicus points out in its brief, and we agree, that "the D.C. Housing Code standards imposed on the landlord do not conflict with the federal housing standards imposed by HUD on properties receiving project-based Section 8 assistance." *Compare* 24 C.F.R. § 886.113 (housing quality standards) *with* 14 DCMR §§ 400.1–899.1 (housing code). Absent such a conflict, therefore, the landlord will be subject to both federal and local law; in this context there is no federal preemption. *See Cruz Management Co.,* 633 N.E.2d at 389–90; *Housing Auth. of Newark v. Scott,* 137 N.J.Super. 110, 348 A.2d 195, 198 (App.Div. 1975). This means that the tenant and HUD can litigate separately to enforce District of Columbia and federal housing standards, respectively. *See Cruz Management Co.,* 633

---

8. A court cannot resolve a case without having jurisdiction. Accordingly, questions of jurisdiction may be raised for the first time on appeal. *See Capitol Hill Hosp. v. District of Columbia,* 600 A.2d 793, 800 (D.C.1991); *Mannan v. Board of Medicine,* 558 A.2d 329, 333 n. 11 (D.C.1989); *Smith v. District of Columbia Dep't of Employment Servs.,* 494 A.2d 1340, 1342 (D.C.1985); *Estate of Dapolito,* 331 A.2d 327, 328 (D.C.1975); *Paton v. District of Columbia,* 180 A.2d 844, 845 (D.C.1962); 5A C. WRIGHT & A. MILLER, FEDERAL

PRACTICE AND PROCEDURE § 1393 at 773 (2d ed. 1990). We assume for present purposes that a Rule 19(a) violation is jurisdictional in nature.

9. HUD is not a party and *amicus* takes the position that HUD is not "indispensable" within the meaning of Rule 19(a).

10. No one contends the tenant's interest comes within Rule 19(a)(2)(ii).

N.E.2d at 389–90. But, of critical significance here, dual lawsuits would not subject the landlord to inconsistent obligations to provide decent, safe, and sanitary housing; both the tenant and HUD would cite essentially the same housing code requirements. *See id.; compare* 24 C.F.R. § 886.113 *with* 14 DCMR §§ 400.1–899.1.

The next concern is whether the landlord confronts a *"substantial* risk of incurring double ... obligations" to the tenant and to HUD for housing code violations. Super.Ct.Civ.R. 19(a)(2)(ii) (emphasis added). Of major significance is the fact that HUD cannot seek a rent abatement from the project owner-landlord without first giving the owner notice of, and an opportunity to cure, the alleged code violations. *See* 24 C.F.R. § 886.123(a) & (d); HAP contract, *supra* note 1, § 26b; *Cruz Management Co.,* 633 N.E.2d at 389. Both in a memorandum to the trial court and in its post-argument brief in this court, see *supra* note 2, the tenant represented that HUD has never notified the landlord about the need for corrective action, and neither the landlord nor HUD (as *amicus*) has claimed otherwise, despite unquestioned opportunity to do so. Furthermore, no one claims that, at this late date, HUD could piggyback on the notice Multi–Family has received from the tenant in this litigation—especially because the tenant's notice in the form of a defense and counterclaim in the eviction action did not give the landlord an opportunity to cure. *See* 24 C.F.R. § 886.123(d). Without expressly ruling on the rights of HUD (who is not a party) under the contract, I can say, nonetheless, from this "notice" analysis that Multi–Family, the landlord here, does not face a "substantial" risk of a "double" obligation for rent abatements payable to the tenant and to HUD, even if we were to rule that the tenant is entitled to 100% of the abatements the trial court ordered ($4,218.35). See *supra* note 4.

I reach this conclusion without having to rely on the proposition that the landlord could implead HUD during the abatement phase of the eviction proceeding if worried about a double recovery. We recognize, as *amicus* points out, that sovereign immunity might inhibit such an effort if HUD were to resist joinder. It is important to note, however, that Multi–Family—which is the only party claiming on appeal that HUD is an indispensable party—never sought to join HUD at trial. Therefore, but for the untested possibility that HUD might have resisted joinder, Multi–Family has no excuse for raising the double recovery issue for the first time on appeal. It arguably follows that, insofar as the landlord's interest is at issue under Rule 19(a)(2)(ii), that interest has been waived. As the Supreme Court noted in elaborating on Federal Rule 19:

> [T]he defendant may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he [or she] shares with another. *After trial, however, if the defendant has failed to assert this interest, it is quite proper to consider it foreclosed.*

*Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968) (emphasis added).

The landlord cannot effectively argue against a Rule 19(a)(2)(ii) waiver on the ground that there was no reason to believe a court would order 100% of the abatements paid to the tenant, and thus that there was no reason to try to implead HUD to avoid the possibility of a later suit leading to double recovery—by the tenant and by HUD—of the abatements allocable to HUD's subsidy. As elaborated below, the landlord—as Multi–Family itself contends—had every reason to be concerned that the trial court might not properly award a portion of the abatements to HUD, a non-party to the litigation. Consequently, the landlord also had reason to know that, as between tenant and landlord, with HUD out of the picture, there were sound arguments for awarding 100% of the abatements to the tenant, rather than permitting the landlord to retain all of HUD's payments—allocable in part to unsafe or unsanitary premises—that unquestionably would be refundable as rent abatements to the tenant if the housing were not subsidized by a third party.[11]

---

11. We also tend to agree (without relying on) *amicus*' assertion that the likelihood of HUD's

pursuing Multi–Family or any other Section 8 landlord from around the country for housing

In sum, neither HUD's nor the landlord's interests will be adversely affected in a way that makes HUD an indispensable party under Rule 19(a). Having considered all relevant elements of the Rule, I conclude that this action properly went forward without HUD (the United States).

### III. COURT ORDERED COMPENSATION TO A NON-PARTY (HUD)

#### A.

The trial court's order initially may appear equitable in allocating rent abatement payments to the tenant and to HUD, respectively, according to the percentage of the total amount each has paid the landlord for the tenant's apartment. There is, however, a serious question—at least as this judge sees it—whether the trial court had authority to order the landlord to pay anything to HUD, not because that order was beyond the scope of relief the parties had requested [12] but, fundamentally, because HUD was not a party to the litigation.

The seminal authority on this question is the Supreme Court's decision in *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). In that case, the Administrator of the Office of Price Administration filed an action to enforce compliance with the Emergency Price Control Act of 1942, specifically to order restitution of rents to third parties collected by a landlord in excess of the permissible maximums. The dispute centered on the question whether the

government's essentially equitable—injunctive—powers under the statute also included authority to seek rebates for non-party tenants of excessive rents the landlord had charged them. The majority found such authority in the trial court's inherent equity jurisdiction exercised under a statute authorizing "a permanent or temporary injunction, restraining order, *or other order.*" *Id.* at 397, 66 S.Ct. at 1089. The dissenters found no restitution remedy, given another statutory provision authorizing the tenants themselves—within thirty days—to seek rebates, failing which the government could seek such rebates for the U.S. Treasury. *Id.* at 403, 66 S.Ct. at 1091–92. *See also United States v. Moore*, 340 U.S. 616, 71 S.Ct. 524, 95 L.Ed. 582 (1951) (citing *Porter* in ruling that United States had authority under "other order" provision of Housing and Rent Act of 1947, as amended, to order restitution of overceiling rentals to tenants).

As noted above, the HAP contract has an "other relief" provision that perhaps, under *Porter* and *Moore*, could serve as the basis for HUD (the United States) to seek rent abatements for tenants, such as Hancock here, who live in substandard federally subsidized housing. But HUD and its HAP contract with Multi–Family are not at issue in this case; we deal only with a common law rent abatement defense and counterclaim in a local landlord and tenant eviction action. There is no relevant statute providing for rent abatements.[13] Thus, the question be-

code violations in particular housing units is speculative. It appears that typically, as in this case, the tenants themselves, not HUD, take such action invoking local, not federal, law, commonly in defense of summary eviction actions.

**12.** The trial court, acting *sua sponte*, ordered a monetary award to HUD simply because the "court believes that this is a fair and equitable resolution of the issue," contrary to the general rule that "a remedy desired by *none* of the parties should not be forced upon them." *Robinson v. Lorillard Corp.*, 444 F.2d 791, 803 (4th Cir.), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) *and cert. dismissed, sub nom. Tobacco Workers Int'l Union v. Robinson*, 404 U.S. 1007, 92 S.Ct. 651, 30 L.Ed.2d 655 (1972); *see* 6 JAMES WILLIAM MOORE, FEDERAL PRACTICE § 56.62, at 1208 (2d ed. 1969). This rule reflects the more general proposition that, "even if a court has original general jurisdiction, criminal

and civil, at law and in equity, it cannot enter a judgment which is beyond the claim asserted, or which, in its essential character, is not responsive to the cause of action on which the proceeding was based." *Standard Oil Co. v. Missouri*, 224 U.S. 270, 281, 32 S.Ct. 406, 409, 56 L.Ed. 760 (1912); *see Sylvan Beach v. Koch*, 140 F.2d 852, 861 (8th Cir.1944) (court may consider only the issues raised by pleadings, and judgment may not extend beyond such issues nor beyond relief demanded); *Steffen v. United States*, 213 F.2d 266, 272 (6th Cir.1954) ("A court may not properly enter a judgment which goes beyond the claim asserted in the pleadings.").

**13.** The closest a statute comes is D.C.Code § 45–2591(a)(2) (1990), which imposes penalties, including a rent rollback, when the Rent Administrator or the Rental Housing Commission determines that a housing provider has substantially

comes whether the trial court has inherent equitable authority to allocate and order payment of some of the rent abatements to HUD, a non-party, simply because the "court believes that this is a fair and equitable resolution of the issue." See *supra* note 12.

The court would appear to have no such authority. *Porter* justified the court-ordered refunds in part because of the "inherent equitable powers of the District Court," 328 U.S. at 398, 66 S.Ct. at 1089, and especially because "the public interest [was] involved in a proceeding of this nature." *Id.* But, of critical significance, the Supreme Court tied that equitable jurisdiction to the statute:

> An order for the recovery and restitution of illegal rents may be considered a proper "other order" on either of two theories:
>
> (1) It may be considered as an equitable adjunct to an injunction decree....
>
> * * * * * *
>
> (2) It may be considered as an order appropriate and necessary to enforce compliance with the Act.

*Id.* at 399, 400, 66 S.Ct. at 1089, 1090. In the present case, in contrast, the rent abatement order is not "an equitable adjunct to an injunction decree," *id.* at 399, 66 S.Ct. at 1089; the abatements grew out of the landlord's legal action for unpaid rent and the tenant's corresponding legal action to recover overpayments of rent deposited in the court registry or held by the landlord.[14] Nor is there a provision authorizing rent abatements as a way of "enforc[ing] compliance," *id.* at 400, 66 S.Ct. at 1090, with a statute; the abatements are a common law remedy. Accordingly, the trial court had no statutory source, and thus, it would seem, no authority, for ordering Multi–Family to pay rent abatements to HUD. See *State v. Jonathan Logan, Inc.*, 301 Md. 63, 482 A.2d 1 (1984) (statute authorizing state to bring civil action to enjoin antitrust violations did not authorize court of equity to order enjoined price fixer to pay damages to state for redistribution to retail purchasers);[15] *FSC Sec. Corp. v. McCormack*, 630 So.2d 979 (Miss.1994) (en banc) (reversing award of half the punitive damages in securities fraud case to state of

---

reduced or eliminated services previously provided for a rental unit in rent controlled premises. See *Afshar v. District of Columbia Rental Hous. Comm'n*, 504 A.2d 1105, 1108 (D.C.1986) ("If the landlord cuts back or eliminates services without triggering a rent-ceiling reduction, a rollback serves to bring the rent into line with the services the landlord actually provides"). That provision is not directed at, and clearly is not limited to, housing code violations and, in any event, is not applicable here.

**14.** This case essentially has become a so-called *"McNeal"* hearing, see *McNeal v. Habib*, 346 A.2d 508 (D.C.1975), on disbursement of funds in the court registry where the tenant asserts a defense under *Javins v. First Nat'l Realty Corp.*, 138 U.S.App.D.C. 369, 428 F.2d 1071, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970), based on housing code violations that allegedly breach the implied warranty of habitability. At the outset of this proceeding, the landlord applied for a protective order requiring the tenant to pay monthly rent into the court registry. That landlord's application, conceptually, "commenc[ed] a 'discrete equitable proceeding' that 'parallel[s]' but is 'not part of the underlying possessory action.'" *Habib v. Thurston*, 517 A.2d 1 (D.C.1985), *amended on rehearing*, 517 A.2d 14, 22 (D.C.1986) (citation omitted). But the tenant's claim to disbursement of the escrowed funds representing the rent abatements (coupled with the tenant's claim for additional

abatement payments by the landlord)—the proceeding at issue in this case—is a money claim for damages, not an equitable action. "[W]hat began as a parallel 'equitable proceeding' effecting 'no permanent disposition of property' pending resolution of the possessory action ... has become a money claim—an action at law—for withheld rent (or unliquidated damages), answered by a *Javins* defense seeking an abatement," *id.* at 23, and entitling either party to a jury trial (if requested). See *id.* at 24.

**15.** In *Jonathan Logan, Inc.*, the Court of Appeals of Maryland construed *Porter* to require statutory authorization of court-ordered payments to a non-party:

> Maryland law has no counterpart to *Porter v. Warner Co.*, *supra*, of which we are aware. The Attorney General has not referred us to any decision under which a Maryland administrator's statutory power to enforce by injunction, standing alone, was held impliedly to carry with it the authority to obtain "restitution" for those intended to be benefited by the regulatory scheme. *The indications are that when the General Assembly intends an equity court to be able to award money for the benefit of non-party third persons in an injunction enforcement action brought by an administrator, it specifically expresses that intent.*

482 A.2d at 5 (emphasis added).

Mississippi because state was not a party).[16]

I therefore do not believe this court can say, absent an authorizing statute, that the trial court had inherent equitable power to order relief in the form of damages payable to HUD, a non-party.

### B.

■ Even if the trial court, as a court of general jurisdiction, had equitable authority to order a portion of the rent abatements paid to a non-party, there are important reasons why the court should not have done so. In the first place, neither party suggested to the trial court that HUD was a proper recipient of relief. See *supra* note 12. While this fact is not of utmost significance, it at least signals caution; the court should be especially careful before becoming, in effect, an advocate for a third party not involved in the lawsuit.

Second, as discussed above in Part II., the record indicates that HUD apparently is not entitled to any monetary claim against the landlord for a rent abatement because of HUD's failure to give the landlord notice of, and an opportunity to cure, alleged housing code violations, as required by the HAP contract and by federal regulations. See 24 C.F.R. § 886.123(d). It may be difficult for HUD to learn about, and give notice to cure, code violations without some direct relationship with the tenant. On the other hand, HUD wrote the HAP contract and thus must live with its terms. HUD, for example, could have required the owner-landlord to notify HUD whenever code violations were alleged and thereby could have created a way for HUD to police the HAP contract without risk of losing important rights.

■ Finally, it is not entirely clear under the contractual matrix comprised of the lease of the premises, see *supra* note 5, and the HAP contract, see *supra* note 1, that HUD has the right to a portion of the abatements vis-a-vis the tenant. The tenant argues, for example, that he is a third party beneficiary of the HAP contract between HUD and the landlord.[17] If that were the case, HUD

16. In *FSC*, the trial court had relied primarily on Miss.R.Civ.P. 71, which is substantively similar to Fed.R.Civ.P. 71 and Super.Ct.Civ.R. 71. The Mississippi rule provided in part: "When an order is made in favor of a person who is not a party to the action ... he [or she] may enforce obedience to the order by the same process as if he [or she] were a party...." The Supreme Court of Mississippi could find no authority in this rule for the trial court, *sua sponte*, to turn a non-party, the state, into a party "solely for the purpose of sharing in the punitive damage award"; either common law or statutory authority is required for that purpose. *FSC*, 630 So.2d at 988, 989. While Super.Ct.Civ.R. 71 could be read to imply that a court may make an award in favor of a non-party, that will be true only if there is a jurisdictional basis for doing so. All the cases I have found that rely on Fed.R.Civ.P. 71 concern situations in which a non-party who would benefit from a judge's order is a third-party beneficiary attempting to enforce an order authorized by statute. Furthermore, most of these cases pertain to consent decrees or to similar orders, in contrast with the money award in the present case. *See, e.g., Beckett v. Air Line Pilots Ass'n,* 301 U.S.App.D.C. 380, 386–89, 995 F.2d 280, 286–89 (1993) (although not party to consent decree, non-union pilots were permitted to enforce decree against union); *Hook v. State of Arizona, Dep't of Corrections,* 972 F.2d 1012, 1014–15 (9th Cir.1992) (inmates entitled to enforce earlier consent decree governing prison mail regulations); *Washington Hosp. v. White,*

889 F.2d 1294, 1299 (3d Cir.1989) (third-party beneficiary of court-ordered stipulation had standing to enforce stipulation); *Berger v. Heckler,* 771 F.2d 1556, 1565–67 (2d Cir.1985) (nonparties to original consent decree regarding eligibility of certain aliens for Supplemental Security Income benefits could seek to enforce decree); *Sawyer v. Dollar,* 89 U.S.App.D.C. 38, 42–43, 190 F.2d 623, 627–28 (1951) (even though Secretary of Commerce was not party to the action, district court was directed to enforce an order to return stock against the Secretary, who had gained possession of stock from named defendant after action had been initiated).

17. *Compare Ashton v. Pierce,* 230 U.S.App.D.C. 252, 716 F.2d 56 (1983) (as amended by 232 U.S.App.D.C. 367, 723 F.2d 70 (1983)) (in action against HUD challenging components of Lead–Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4801–4846 (1976), tenants are third-party beneficiaries of HUD Annual Contributions Contract (ACC)) *and Holbrook,* 643 F.2d 1261 (tenants are intended beneficiaries of HUD contract with landlords under Special Allocations component of Section 8, § 1437f, in spite of HUD's contention that tenants are only incidental beneficiaries to such contracts) *and McNeill v. New York City Hous. Auth.,* 719 F.Supp. 233 (S.D.N.Y. 1989) (tenants are third party beneficiaries of HAP contracts in suit against local housing authority) *and Zakaria v. Lincoln Property Co., No. 415,* 185 Cal.App.3d 500, 229 Cal.Rptr. 669, 674 (1986) (tenant holders of Section 8 certificates

would have relinquished all rights in the subsidy funds to the tenant to enable him to pay the rent. As a consequence, HUD would have relinquished with each subsidy payment any claim—any eventual lien—based on rent abatements attributable to housing code violations. Because the tenant did not present this theory to the trial court, I cannot properly resolve its merits here. *See President & Directors of Georgetown College for Georgetown Univ. v. Diavatis*, 470 A.2d 1248, 1251 (D.C.1983) (citing *Miller v. Avirom*, 127 U.S.App.D.C. 367, 384 F.2d 319 (1967)).[18] But, whether the third party beneficiary theory is ultimately valid or not, I cannot overlook the fact that it is not without respectable precedent. See *supra* note 17. HUD was in a position to negate this interpretation, traceable to case law as early as 1981 (*Holbrook*, see *supra* note 17), by making clear in the parties' 1984 HAP contract—which HUD did not—that the tenant is not a third party beneficiary and thus has no rights in HUD's equitable share of any rent abatements attributable to housing code violations.[19] In addition, HUD in effect could have asserted its interest in the proceeding by drafting the HAP contract to require the owner-landlord to act as HUD's agent or trustee for payment of abatement funds from the court registry, or from the landlord's own bank account, when the court allocates to HUD a portion of the overpayments for the substandard premises.

HUD's failure to clarify the situation, therefore, casts further doubt on the propriety of the court's asserting on HUD's behalf, *sua sponte*, an equitable lien on the escrowed rents in the court's registry (as well as in the landlord's bank account) in this purely legal action, see *supra* note 14, between landlord and tenant. I simply cannot say the equity is well enough established to warrant that kind of trial court interference in a two-party proceeding. Indeed, any right HUD ultimately may have to a portion of the abatement proceeds would not be legally prejudiced by a court order for payment of all rent abatements to the tenant, since any judgment to which HUD is not a party cannot have a preclusive effect on HUD's contract rights vis-a-vis tenant or landlord. See *supra* Part II.

In short, use of the court's equitable power to award money to HUD has legal hurdles that preclude the trial court's order in favor of HUD here.

---

entitled to sue as third party beneficiaries of federal housing program) *and Ayala v. Boston Hous. Auth.*, 404 Mass. 689, 536 N.E.2d 1082, 1088–90 (1989) (minors are third party beneficiaries of ACC and HAP contracts in action to recover for damages attributable to lead paint hazards) *and* Robert S. Adelson, *Third Party Beneficiary and Implied Right of Action Analysis: The Fiction of One Governmental Intent*, 94 YALE L.J. 875, 888–90 (1985) (§ 1437 grants HUD discretion to contract in favor of third party rights) *and* Arthur R. Block, *Enforcement of Title VI Compliance Agreements by Third Party Beneficiaries*, 18 HARV.C.R.–C.L.L. REV. 1, 28 (1983) ("The most detailed and sound model for analyzing third party beneficiary claims in this area is the Seventh Circuit's decision in *Holbrook v. Pitt*.") *and* Deborah Kenn, *Fighting the Housing Crisis with Underachieving Programs: The Problem with Section 8*, 44 WASH.U.J.URB. & CONTEMP L. 77, 92 (1993) (hereafter *Fighting the Housing Crisis*) ("Recent state and federal decisions are consistent with the reasoning of *Holbrook* and *Ashton*.") *with Perry v. Housing Auth. of Charleston*, 664 F.2d 1210, 1218 (4th Cir.1981) (relying on "clear" prior case law, court concluded that tenants are not third party beneficiaries of ACC under §§ 1437 *et seq.*) *and Smith v. Washington Heights Apartments, Ltd.*, 794 F.Supp. 1141, 1144

(S.D.Fla.1992) (tenants not third party beneficiaries under HAP contract) *and Reiner v. West Village Assocs.*, 768 F.2d 31 (2d Cir.1985) (tenants not third party beneficiaries of HUD mortgage insurance program contract under 12 U.S.C. § 1715n).

18. The landlord acknowledges in its opening brief that the "tenant in his memoranda before the lower court argues that he is a third party beneficiary of the HAP contract with HUD." No tenant's memorandum in the record supports that acknowledgement; the trial court never dealt with the issue (while dealing with the benefit-of-the bargain issue); and the tenant has not stated in any appellate brief that the issue had been advanced at trial. In its *amicus* brief, see *supra* note 2, HUD argued against the tenant's claimed third party beneficiary status.

19. Indeed, as early as 1979, HUD apparently included for awhile "a clause in the HAP contract preventing third party beneficiary claims." Deborah Kenin, FIGHTING THE HOUSING CRISIS, 44 WASH.U.J.URB. & CONTEMP. L. at 92 (citing DEPT. OF HOUSING AND URBAN DEVELOPMENT PUBLIC HOUSING AGENCY ADMINISTRATIVE PRACTICES HANDBOOK FOR THE SECTION 8 EXISTING HOUSING PROGRAM, 7420.F (Nov. 2, 1979) at app. 26–A).

## IV. RENT ABATEMENTS PAYABLE TO SUBSIDIZED TENANT

This case therefore comes down to the question whether, as between tenant and landlord, the landlord shall be (1) ordered to pay the tenant 100% of the abatements which the court found appropriate (and are not questioned here) based on the reduced value of the tenancy (measured by reference to its total monthly fair market value)—thereby crediting the tenant with the amounts the court found allocable, respectively, to the tenant *and* to HUD; or instead (2) ordered to pay the tenant only the abatements the court found allocable to the tenant, based solely on the monthly rentals he paid—thereby allowing the landlord to keep the money representing the abatements the trial court had ordered paid to HUD.

The tenant claims 100% of the rent abatements by proffering two alternative, though similar, theories summarized at the outset of this opinion: "benefit-of-the-bargain" and "third party beneficiary." For reasons that follow, the first theory works for the tenant vis-a-vis the landlord. I conclude that, as between the parties, the tenant is entitled to 100% of the court-ordered abatements, including the portion the court ordered paid to HUD.

In the first place, I perceive no sound basis for shielding a private landlord from liability the landlord otherwise would have, in the absence of a subsidized tenancy, when providing substandard housing; as between landlord and tenant, "it is certainly fairer to compensate [the tenant] fully than it is to allow [the landlord], which failed to act diligently and responsibly as a landlord, to retain rent payments made on [the tenant's] behalf." *Cruz Management Co.*, 633 N.E.2d at 388 (federally subsidized Section 8 tenant awarded 50% abatement on full rent received by landlord from tenant and HUD, not just on portion paid by tenant).

Second, the tenant bargained with the landlord and executed a lease for an apartment expressly reflecting the value of the tenant's rentals and HUD's subsidy combined. See *supra* note 5. By signing the lease, the landlord recognized the tenant's eligibility for, and thus his right to, a $560/month–, not a $168/month–, quality apartment. It follows that, as between tenant and landlord, compensation for landlord-caused diminution in the bargained-for value should be payable in full to the tenant; otherwise, the landlord would be permitted to deliver less than promised without receiving a corresponding reduction in rent. *See Cruz Management Co.*, 633 N.E.2d at 388.[20]

**20.** It is important to understand that the allocation of rent abatements in Section 8 housing, where there are three potential parties—tenant, private landlord, and HUD—differs significantly from rent abatement analysis when traditional public housing is at issue and the units are owned by the government-landlord. In the latter situation, the local public housing authority, typically subsidized by federal funding, is in a position to build and rent government-owned housing units with below-market rents that fit the budgets of low-income persons. In two cases where the courts found that such public housing units failed to meet local housing code requirements, the courts ordered rent abatements taken against the tenants' below market rents, rather than against higher, theoretical rent levels at which free-market forces would value the housing units (reflecting the government's per-unit subsidies plus the tenants' rentals). *See Housing Auth. of E. St. Louis v. Melvin*, 154 Ill.App.3d 999, 107 Ill.Dec. 920, 925, 507 N.E.2d 1289, 1294 (1987); *Scott*, 348 A.2d at 199. The courts were concerned that, if a free-market monthly rent level were imputed to a public housing unit (say $500 instead of $100), the abatement (say

10%) would, theoretically, have to be taken off the top, in which case the hypothetical $500 apartment would be valued at $450, leaving the tenant to pay his or her $100 without benefit of abatement. The courts therefore applied the percentage abatement to each tenants' below-market rent, resulting, in the above hypothetical situation, in a 10% rent reduction from $100 to $90. The courts concluded: " 'It would frustrate this objective [of decent housing for the needy] to allow a "rebate" against a higher, theoretical rent which would result in requiring the tenant to pay the original rent for standard housing.' " *Melvin*, 107 Ill.Dec. at 925, 507 N.E.2d at 1294 (quoting *Scott*, 348 A.2d at 199).

The public housing model does not help inform our decision in this Section 8 case, except to underscore the public policy that rent abatements are to benefit the tenant. Even if the *Melvin* and *Scott* courts were to have imputed free market rental values ($500) to the units at issue—clearly, a most complicated exercise—and awarded a 10% abatement ($50), the government-as-subsidizer would be entitled to $40, even if the government-as-landlord would be entitled to nothing. In a Section 8 housing case, howev-

The fact that HUD has contributed a major portion of the rent may entitle HUD, if it wants to seek it, to recover from the tenant the portion of the abatements attributable to HUD subsidies, based on an unjust enrichment argument. Under the benefit-of-the-bargain theory, therefore, which permits the tenant to recover from the landlord 100% of the abatements, HUD may have an equitable lien on a portion of the abatements. But there is no way that the landlord could be said to have retained such an equity vis-a-vis the tenant. *See generally Javins v. First Nat'l Realty Corp.*, 138 U.S.App.D.C. 369, 428 F.2d 1071, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

Furthermore, as indicated earlier in Part III.B., HUD's equity is not clear cut. Although I do not reach the merits of the tenant's third party beneficiary argument, see *supra* notes 17–18, I cannot altogether ignore the fact that the tenant, as a matter of law, may be a third party beneficiary of the HAP contract between HUD and the landlord. This possibility, like the benefit-of-the-bargain analysis, reinforces an unassailable proposition: entitlement to abatements allocable to code violations in Section 8 subsidized housing is a matter of deciding between HUD and the tenant; the landlord is not included among potential claimants under any proffered legal theory premised on abatements attributable to conceded housing code violations.

As already indicated, moreover, any action HUD may have against the landlord under the HAP contract faces difficulties that very well may preclude double recovery against the landlord. In any event, if that were to occur—if HUD had the right to abate Section 8 subsidy payments and were to seek them from the landlord—the landlord presumably could implead the tenant as another defendant, contending either that HUD's claim was more properly directed at the tenant as an equitable lien reserved under the benefit-of-the bargain theory, or that the ten-

ant was a third party beneficiary of the HAP contract to whom HUD had relinquished all right to the abatements.

Finally, there is a caveat. The facts here limit this opinion to a situation where the abatement based on the fair market value, reflecting the HUD subsidy and tenant rent combined, will not exceed the rent payable by the tenant. For example, a 25% abatement, see *supra* note 4, based on the monthly $560 market rent would be $140. When applied to the tenant's $168 monthly rent, the abatement would leave $28 in tenant rent due. If, on the other hand, there were a 50% abatement, the same market rent would yield a $280 abatement which, when applied to a tenant's $168 monthly rent, would leave a negative $112. I do not express an opinion here on whether this would trigger the landlord's obligation under the HAP contract to subsidize a negative Net Family Contribution for rent, see *supra* note 7, or otherwise would extend the abatement liability that far.

\* \* \*

For the reasons explained above and summarized at the outset of this opinion, I would reverse the judgment and remand the case for entry of an order awarding the rent abatements in full to the tenant, Hancock.

## V. Postscript

Judge STEADMAN appears to agree with the foregoing analysis, except for Part III.A. and the disposition in Part IV. He would remand for further proceedings rather than awarding the entire abatement to the tenant. My colleague's remedy is unsound because, in practical effect, it is a ruling that HUD is an indispensable party, which Judge STEADMAN himself agrees is not legally the situation.

A remand here means the court is ruling that the trial court plainly erred—caused a miscarriage of justice—in failing to exercise its discretion to invite HUD to intervene in

---

er, where the subsidizer and the landlord are different parties, we face a question not presented in the public housing model: who, as between landlord and tenant, should receive the abatement on the acknowledged fair-market value of the apartment? I think the tenant must prevail

because I conclude that the landlord should be the last of the three interested parties to get any part of the abatement, leaving room for the government subsidizer to get its share in a separate proceeding unless the tenant is held to be a third-party beneficiary of the subsidy.

the proceeding pursuant to Super.Ct.Civ.R. 24. This remedy implies that HUD must be invited to participate, at least at the remedial stage, in every landlord and tenant dispute over housing conditions in Section 8 subsidized housing—a result with a potentially disruptive impact on the local court system, as well as on the federal government. According to the *amicus* brief filed on HUD's behalf:

> In responding to the Court's questions, we wish to emphasize that the routine joinder of HUD in landlord-tenant disputes like the one at issue here would seriously interfere with the agency's performance of its mission and statutory functions. At the beginning of fiscal year 1994, HUD provided an estimated 5.8 million households with rental assistance. Overview of Entitlement Programs: 1994 Green Book, Committee on Ways and Means, Committee Print No. 103–27 (1994), p. 819. The federal regulatory scheme vests HUD with its own powers to enforce the rights and obligations attached to this rental assistance under HUD's separate contract with the landlord. See 24 CFR 886.120, 886.123. Allowing HUD to be impleaded without its consent into every local landlord-tenant dispute, however, would dissipate the agency's enforcement resources, divesting the agency of the authority to set priorities for determining whether and when to institute judicial actions against landlords who fail to comply with obligations imposed by federal law.

I recognize that Judge STEADMAN's proposed "invitation to intervene" under Rule 24 may not be as disruptive as the mandatory, "routine joinder" feared by HUD. But for all practical purposes HUD's preparation time in deciding what to do in either case is likely to be a significant burden on federal resources unless HUD routinely waives the opportunity to appear. This proposed remand, therefore, begins a bad precedent. If HUD had found this remand alternative desirable as a fallback, were we not to sustain the trial court's order, *amicus* could have said so. But it did not. *Amicus* simply relied on *Porter,* see *supra* Part III.A., to say "let HUD keep the money"; no middle ground was sought.

But even more to the point, HUD very simply could have protected itself against an award to a tenant of HUD's claimed share of a rent abatement by modifying the HAP contract to make clear (if that be the case) that tenants are not third-party beneficiaries of HUD subsidies—as apparently HUD did for awhile as early as 1979. See *supra* note 19. Or HUD could have taken other contractual steps to assure that abatements allocable to the portion of the rent supplied by HUD are held for HUD by the landlord as agent or trustee. But HUD has eschewed such simple, protective measures.

There is no concrete indication, moreover, that a remand hearing will have a factual issue to resolve. In unanimously agreeing that HUD is not an indispensable party, this division has concluded that there is not a substantial risk that the landlord will incur double obligations to the tenant and to HUD if the tenant receives 100% of the abatements; HUD apparently has waived any such claim by failing to give the landlord notice of, and an opportunity to cure, the code violations as required by the HAP contract and federal regulations. I am aware of no other factual concern that could give the trial court a reason to get involved; this, really, is a legal case this court is equipped to decide without further trial court assistance.

The cases cited by Judge STEADMAN pertain solely to Rule 19 analysis, recognizing a legitimate court role in asking a potential party if it wishes to intervene before the court has to rule on whether such participation is indispensable. Because this court unanimously agrees HUD is not an indispensable party, I do not see how the trial court plainly erred in failing to follow Rule 19 authority as a basis for inviting participation under Rule 24.

Of course the trial court lawfully could have exercised discretion to invite HUD to participate. But that did not happen. We therefore confront no Rule 19 problem; we know HUD's aversion to participation in local landlord and tenant proceedings, as expressed in *amicus'* plea against "routine joinder"; we are aware that HUD has rejected the opportunity to protect any claim it

may have to rent abatements by amending the HAP contract; and we can see no evident fact-finding role for the trial court on remand. I therefore see no reason why this court should grant HUD special protection—a proverbial bite at the apple that HUD itself has manifestly elected not to preserve. If HUD were disturbed by payment of 100% of the abatements to the tenant and claimed a portion of them, HUD could file an action to recover HUD's allotment from the tenant.

I see the remand as a decision by the court to punt, rather than to decide a case as between two parties, landlord and tenant, when a potentially interested third party, HUD, has effectively opted to stay out of such proceedings.

STEADMAN, Associate Judge:

██ Judge Ferren in Parts I, II, and IIIB of his opinion points out quite convincingly why several *possible* legal obstacles to HUD's right to a portion of the rental rebate both precluded HUD as an indispensable party under Super.Ct.Civ.R. 19 and rendered erroneous the trial court's order, on this record, directing payment to HUD. I therefore join those portions of his opinion.[1] I also agree, for the reasons set forth in Part IV of his opinion, that *if* the case comes down to one purely between the landlord and the tenant, the tenant—the one after all who directly bore the brunt of the Housing Code violations—should receive the full rebate.

However, I do not think that the trial court erred in recognizing *sua sponte* that a nonparty *might* have an interest in the outcome of the litigation. The error, where neither party advocated any such action and where, as it turns out, significant possible legal obstacles may exist with respect to any claim of the nonparty,[2] was in directly ordering payment to the nonparty without more. By doing so, the trial court truly becomes an advocate for the nonparty. Rather, the ap-

propriate course of action was to invite HUD to make its case to the court. While equitable discretion might exist to allow such a showing to be made in a less formal way, it would seem the most appropriate mechanism would be intervention by HUD under Super.Ct.Civ.R. 24.

I have no doubt that a trial court has the discretion sua sponte to invite intervention. With respect to Rule 19, the advisory committee notes appear to contemplate a situation similar to that presented here:

> In some situations, it may be desirable to advise a person who has not been joined of the fact that the action is pending, and in particular cases the court in its discretion may itself convey this information by directing a letter or other informal notice to the absentee.

Fed.R.Civ.P. 19 advisory committee's note.

In *Fernandes v. Limmer*, 663 F.2d 619 (5th Cir.1981), *cert. dismissed*, 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982), the court noted that the fact that a third party had declined to join a suit, at the trial court's invitation, weighed heavily against a finding that party was indispensable:

> [T]he airlines [the third parties] themselves do not believe that they will be affected by this litigation. The district court invited the airlines to join the litigation, but they refused the invitation. The airlines' decision, of course, is not dispositive of this issue; however, it strengthens our conclusion that their absence is not a fatal blow to jurisdiction.

*Id.* at 636.

In *Babcock v. Maple Leaf, Inc.*, 424 F.Supp. 428 (E.D.Tenn.1976), the court contemplated whether the federal government should be joined in an action, and decided to first invite the government to join, before ruling on the government's status as a rule 19 party:

---

**1.** I agree with Judge Farrell that the Superior Court, a trial court of general jurisdiction, has the power, the jurisdiction if you will, to order monetary payment in an appropriate case to a nonparty even where such a remedy has not been sought by any party litigant. Therefore, I do not join Part IIIA of Judge Ferren's opinion.

**2.** By contrast, in *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the government as a party was strongly advocating direct payments to the nonparties, whose ultimate right thereto was apparently not in dispute.

In the instant case it would appear that the interests of all parties, including the interests of judicial economy, would be best served by a joinder of the Government.... Before the court can order a joinder of parties who should be additional plaintiffs in a lawsuit, however, Rule 19(a) provides that such parties must first refuse to join voluntarily.[3] Since there is no indication that the Government would not join this lawsuit if given notice and opportunity to do so, the Court will allow the Government a period of time in which it may intervene in this action as a party plaintiff. If at the end of such period the Government refuses to join in this action, the defendants may renew their motion to add the Government as a defendant.

*Id.* at 431 (citations omitted).

I see no reason why a trial court should not similarly have the discretion to invite a nonparty to intervene under Rule 24. If the nonparty declines the invitation, then, as in *Fernandes,* I think the trial court may assume that the nonparty intends to protect its interests, if any, in another manner and proceed to dispose of the case as one between the parties alone. Here, that would mean the payment of the entire rebate to the tenant, as Judge Ferren sets forth in his part IV.

It may be suggested that such an approach will lead in practice to the involvement of HUD in every garden-variety landlord-tenant dispute in a HUD-subsidized project. This need not be the case. As Judge Ferren points out, HUD is in a position to fully establish and protect its right to a proportional rebate through appropriate contract or regulatory provisions and with the protection of the supremacy clause. With that right clearly established, I agree with Judge Farrell that the equitable power of the trial court would justify an order that such payment be made by the landlord.

In the present posture, however, I believe it is quite inappropriate for an appellate court in the first instance to attempt to resolve the question of a nonparty's rights in the litigation. Those should first be present-ed to the discretionary decision-maker, who has both the ability and the responsibility to deal with factual elements which may relate to the nonparty's rights and who furthermore should make the initial decision as to such rights. Therefore, I would reverse the judgment appealed from insofar as it orders the payment of a portion of the rent rebate to HUD and remand the case for further proceedings consistent with this opinion.

FARRELL, Associate Judge:

This appeal presents a question of remedy. In a landlord's suit for possession of residential premises, where the federal government has subsidized the tenant's rent and a rent abatement is ordered because of housing code violations by the landlord, may the trial court order repayment to the government of its *pro rata* share of the abated rent even though it is not a party to the landlord and tenant litigation? Judge Ferren answers, more or less categorically, "no," and in any event would reject that disposition in the circumstances of this case. Judge Steadman, while agreeing with me that the trial judge has the authority to order monetary payment to a nonparty, would remand the case for resolution of "legal obstacles" that may or may not prevent the government from being repaid its money. I would affirm the judgment outright, as I believe the trial judge both had the authority to award the relief she did and did not abuse her discretion in doing so. In order that there be a judgment of this court concerning what happens next, however, I reluctantly join Judge Steadman's call for a remand.

## I.

The tenant in this case received federal rent assistance under HUD's Section 8 housing program. The assistance was in the form of a project-based subsidy under a program known as the Section 8 Loan–Management Set Aside Program, reserved for financially troubled housing built with financing insured by the Federal Housing Administration. If such projects default on their loan

---

3. Under rule 19, a potential plaintiff who refuses to join voluntarily can be joined as a defendant or as a "involuntary plaintiff." Fed.R.Civ.P. 19(a).

obligations, the FHA mortgage insurance programs will be exposed to liability. HUD will therefore make available Section 8 rental assistance for tenants residing in housing projects where the federal government is financially at risk if the owner defaults on a mortgage. This assistance serves the twin goals of improving the project's economic condition, thereby reducing the risk of default on government insured mortgages, and improving the availability of decent, safe, and sanitary housing for low income tenants. *See* 24 C.F.R. § 886.101 (1994).

In this case, the tenant's lease with the landlord required the tenant to pay from $151 to $168 per month as his rent. HUD's contract with the landlord required it to pay the difference between that amount and the fair market value of the property. HUD's monthly payments to the landlord ranged from $272 to $409.

The landlord sought to evict the tenant for nonpayment of the tenant's share of the rent and brought suit against the tenant. The trial judge, however, found that the landlord had not kept the apartment in compliance with the D.C. Housing Code, that these deficiencies breached an implied warranty of habitability read into every residential lease, *see Javins v. First Nat'l Realty Corp.*, 138 U.S.App.D.C. 369, 428 F.2d 1071, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970), and that the tenant was therefore entitled to a rent abatement (*i.e.*, a reduction in the amount of rent due to the landlord) as a remedy for the landlord's breach.

The judge then turned to calculating the amount of the rent to be abated. First, she compared the value of the apartment as warranted in a habitable condition to the "actual" value of the apartment in its substandard condition. Second, she calculated the percentage reduction in value caused by the housing code violations. Finally, she used this percentage reduction in value to calculate the dollar amount of rent that should be abated.

This last step of the rent abatement calculation generated the issues that divide this court. The landlord asserted that the total amount of rent abatement due the tenant should be determined by applying the per-centage reduction in value attributable to the housing code violations to the tenant's share of the rent. The tenant, in contrast, asserted that the amount of rent abatement due him should be determined by applying the percentage reduction in value to the *entire* rent for the premises.

The trial judge crafted a different remedy, one that effectively made a pro rata allocation of the net dollar amount of rent abatement between the tenant and HUD. The judge agreed that the tenant would be unjustly enriched if his rent abatement were calculated by applying the percentage reduction in the apartment's value to the entire rent due for the premises. On the other hand, the landlord would receive a windfall if it were allowed to retain the full federal rental subsidy without having provided habitable housing. The judge therefore ordered that rent be abated to both the tenant and to HUD, even though HUD was not a party to the case and had not requested such relief. The judge thus ordered the tenant's rental obligation (*i.e.*, the tenant's share of the rent) reduced by an amount equal to the percentage reduction in value caused by the housing code violations. And she ordered the landlord to return to HUD an equivalent percentage of the federal rental subsidies received for the same time period.

## II.

Unlike Judge Ferren, I have no doubt that the trial judge was within her authority to order this remedy even though HUD was not a party to the action. Settled principles of equity jurisprudence teach that a court may fashion remedies that benefit non-parties where that would serve the interests of equity and vindicate important public rights. *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), is an illustration. In *Porter* the federal government sought to enforce against private landlords war-time rent control regulations administered by the federal Office of Price Administration. The government, after establishing violations of the Emergency Price Control Act of 1942 (the Act), sought an order compelling the defendant landlord to

make restitution to the tenants. The Supreme Court held that restitution could be ordered even though the tenants were not parties to the suit. The Court reasoned that a trial court sitting in equity may "mould each decree to the necessities of the particular case" and "adjust and reconcile competing claims ... so as to accord full justice to all the real parties in interest." *Id.* at 398, 66 S.Ct. at 1089 (internal quotations and citations omitted).

The district court's equitable jurisdiction invoked in *Porter* rested on the express statutory authority the Act conferred "to enjoin acts and practices made illegal by the Act and to enforce compliance with the Act." *Id.* at 397–98, 66 S.Ct. at 1089. As the statute did not provide otherwise, "all the inherent equitable powers of the District Court [were] available for the proper and complete exercise of that jurisdiction," *id.* at 398, 66 S.Ct. at 1089, including the ability to order relief to a non-party. Of course, the existence, indeed the requirement, of a statutory basis for the court's exercise of its inherent powers in *Porter* is unremarkable, since federal courts "are courts of limited jurisdiction marked out by Congress." *Aldinger v. Howard,* 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976). But a court of *general* jurisdiction, which the Superior Court of the District of Columbia is, *Andrade v. Jackson,* 401 A.2d 990, 992 (D.C.1979),[1] requires no such specific grant of authority in order "to accord full justice to all the real parties in interest." *Porter,* 328 U.S. at 398, 66 S.Ct. at 1089.

The authority of courts in equity to "do complete rather than truncated justice," *id.,* is nowhere more visible than in the evolving judicial treatment of the landlord and tenant relationship. *Javins, supra,* which established the basis for abatement of rent for housing code violations, is suffused with equitable considerations. *Javins* held that both evolving common law principles and the District of Columbia's housing code require that a non-waivable warranty of habitability be implied in leases for all residential housing in the District. In so holding, the court was influenced profoundly by "[t]he [well-documented] inequality in bargaining power between landlord and tenant":

> Tenants have very little leverage to enforce demands for better housing. Various impediments to competition in the rental housing market, such as racial and class discrimination and standardized form leases, mean that landlords place tenants in a take it or leave it situation. The increasingly severe shortage of adequate housing further increases the landlord's bargaining power and escalates the need for maintaining and improving the existing stock.

*Id.* at 377, 428 F.2d at 1079 (footnotes omitted).

Identical concerns had informed the leading products liability decision, *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69, 87 (1960), to which the *Javins* court looked repeatedly by way of analogy. *See* 138 U.S.App.D.C. at 374 n. 19, 377, 378 n. 49, 428 F.2d at 1076 n. 19, 1079, 1080 n. 49. In rejecting an automobile manufacturer's disclaimer of an implied warranty of merchantability, the New Jersey Supreme Court pointed to Professor Corbin's suggestion that "[i]n the modern consideration of problems such as this ... practically all judges are 'chancellors' and cannot fail to be influenced by any equitable doctrines that are available." 161 A.2d at 85–86. For, whereas "[t]he traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality," in "present-day commercial life the standardized mass contract has appeared" and "is used primarily by enterprises with strong bargaining power and position." *Id.* 161 A.2d at 86.[2] Like *Henningsen, Javins* was

---

1. *See* D.C.Code § 11–921(a) (1995).

2. The court went on to say:

 > The task of the judiciary is to administer the spirit as well as the letter of the law. On issues such as the present one, part of that burden is to protect the ordinary man against the loss of important rights through what, in effect, is the unilateral act of the manufacturer. The status of the automobile industry is unique. Manufacturers are few in number and strong in bargaining position. In the matter of warranties on the sale of their products, ... [f]rom the standpoint of the purchaser, there can be no arms length negotiating on the subject.

an effort to rectify this imbalance through an application of contract principles reflecting "generally prevailing standards of honesty and fair dealing." *Javins,* 138 U.S.App.D.C. at 379 n. 56, 428 F.2d at 1081 n. 56.

Two years before *Javins,* the federal court had made similar observations in holding that retaliation could be asserted by the tenant as a defense to the landlord's suit for possession:

> In trying to effect the will of Congress *and as a court of equity* we have the responsibility to consider the social context in which our decisions will have operational effect. In light of the appalling condition and shortage of housing in Washington, the expense of moving, the inequality of bargaining power between tenant and landlord, and the social and economic importance of assuring at least minimum standards in housing conditions, we do not hesitate to declare that retaliatory eviction cannot be tolerated.

*Edwards v. Habib,* 130 U.S.App.D.C. 126, 140, 397 F.2d 687, 701 (1968), *cert. denied,* 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969) (footnotes omitted; emphasis added).

Finally, the same year *Javins* was decided, the court considered the question of how rent that accrues during the landlord's suit for possession and the tenant's demand for rent abatement is to be treated while the litigation is pending. *Bell v. Tsintolas Realty Co.,* 139 U.S.App.D.C. 101, 109, 430 F.2d 474, 482 (1970). The trial court had required the tenant to pay the rent as it became due into the registry of the court. That requirement, the court recognized, was "extraordinary in the course of civil litigation," *id.* at 108, 430

F.2d at 481,[3] but it found strong countervailing considerations as well.[4] Consequently, having "little doubt that the Landlord and Tenant Branch of the [then] Court of General Sessions may fashion *an equitable remedy* to avoid placing one party at a severe disadvantage during the period of litigation," the court held that "the prepayment of rent requirement as a method of protecting the landlord may be employed in limited fashion." *Id.* at 109, 430 F.2d at 482 (emphasis added).

These decisions are testament to the authority of Superior Court judges, most especially perhaps in landlord and tenant matters, to employ equity "to adjust and reconcile competing claims and ... to accord full justice to ... the real parties in interest." *Porter,* 328 U.S. at 398, 66 S.Ct. at 1089. *See also* Super.Ct.L & T R. 1 ("These Rules ... shall be construed to secure the *just,* speedy, and inexpensive determination of every action" (emphasis added)). That authority, in my view, fully justifies the trial judge's allocation of the rent abatement between the tenant and HUD in proportion as they had paid it. The remedy is consistent with the proportional remedy *Javins* prescribes, which, as the RESTATEMENT (SECOND) OF PROPERTY indicates, is designed "to preserve [the parties'] original bargain in so far as possible." *Id.* § 11.1 cmt. c (1976).[5] Here, viewing the tenant's lease and HUD's payment assistance contract together, the most that can be said is that the tenant and HUD *jointly* bargained for the housing unit in proportion as each was obligated to pay the rent.

*Id.* 161 A.2d at 94.

**3.** "Certainly such a protective order represents a noticeable break with the ordinary processes of civil litigation, in which, as a general rule, the plaintiff has no advance assurance of the solvency of the defendant." 139 U.S.App.D.C. at 106 n. 10, 430 F.2d at 479.

**4.** Given developments in "[r]ecent practice," the "landlord has lost the advantage of the [former] summary proceeding [for possession] and is instead exposed to a prolonged period of *litigation* without rental income." 139 U.S.App.D.C. at 108, 109, 430 F.2d at 481, 482.

**5.** "At trial, the finder of fact must make two findings: (1) whether the alleged violations existed during the period for which past due rent is claimed, and (2) what portion, if any or all, of the tenant's obligation to pay rent was suspended by the landlord's breach." *Javins,* 138 U.S.App. D.C. at 380–81, 428 F.2d at 1082–83 (footnote omitted). The RESTATEMENT lists this as an example of the "proportional value" rule which it adopts as the soundest measure of abatement, whose "effect" is to preserve the parties' "original bargain in so far as possible." RESTATEMENT (SECOND) OF PROPERTY § 11.1 cmt. c & reporter's note 4.

Moreover, just as public policy considerations were central to *Javins'* "implied at law" warranty, so the fashioning of an abatement remedy in a situation not contemplated by *Javins* where the federal government assumes a major part of the rental obligation should take into account the purposes of the subsidy program and the interests of the federal taxpayers. The government as *amicus* persuasively argues that the routine joinder of HUD in local landlord-tenant disputes would seriously impair the discharge of its nationwide statutory functions, given the vast number of households HUD provides with rental assistance annually. Yet, if HUD's absence as a party meant that the entire rent abatement were to be remitted to the tenant, HUD would surely hesitate before granting assistance in cases where it perceives an unacceptable risk that taxpayer money will ultimately be dispensed in this unintended fashion.

In my view, therefore, the trial judge's remedy was a proper exercise of her power to structure relief that was fair to the real parties in interest and would best serve the policies underlying the federal housing assistance program.

### III.

My colleagues find particular obstacles to the judge's return of rent to HUD in this case. For Judge Ferren these are decisive; for Judge Steadman they necessitate a remand so that HUD may "make its case to the court." *Ante* at 1224. The obstacles seem to me at best legal matters as to which, if we were dissatisfied with HUD's treatment of them so far,[6] we could easily seek supplemental briefing by HUD and the parties rather than burden the trial court with another round of this litigation. But I do not view these concerns in any event as sufficient to warrant disturbing the trial judge's exercise of her discretion.

Judge Ferren first makes the factual point that neither party suggested to the judge that HUD was a proper recipient of relief. The answer to this is that neither party had

any incentive to do so, since each was laying claim to HUD's share of the abated rent. The suggestion that the trial court "should be especially careful before becoming, in effect, an advocate for a third party not involved in the lawsuit," *ante* at 1219; see also *ante* at 1224 (opinion of Judge Steadman), ignores the unique status of HUD as a "third party" and the important public interests affected by this remedial issue.

Second, Judge Ferren states that HUD "*apparently* is not entitled to any monetary claim against the landlord for a rate abatement because of HUD's failure to give the landlord notice of, and an opportunity to cure, alleged housing code violations, as required by the HAP contract and by federal regulations." *Ante* at 1219 (emphasis added). My colleagues, while concededly not certain of this reading of the HAP contract and the regulations, are confident enough to cite it as the primary reason for reversing the trial judge's exercise of equitable authority here. But I question seriously the standing of the *tenant,* whom both my colleagues favor as the recipient of the entire rent rebate if HUD may not recover its share, to challenge HUD's noncompliance with assumed contractual duties of notice to the landlord before HUD could seek rent recoupment in an administrative or court proceeding *it* brought against the landlord. Moreover, practically speaking, HUD was never in a position to notify the landlord of deficiencies since there is no evidence that the tenant ever complained to HUD of the substandard conditions—instead asserting code violations for the first time as a defense to the landlord's suit for possession. Judge Ferren apparently recognizes the harshness of the conclusion that HUD in effect waived entitlement to reimbursement, stating only that "HUD wrote the HAP contract and thus must live with its terms." But HUD may very well not "live with its terms," and one may well ask who will bear the consequences of any significant revision of those terms or of HUD's screening criteria. In a landlord's suit for possession leading to a finding that

---

6. We invited HUD's participation in this court as *amicus curiae,* and asked it to answer several questions, none of which in my view called upon it to discuss the matters that now trouble both my colleagues.

he has been unjustly enriched, I do not see how either landlord or tenant can complain about including HUD in the remedy of rent abatement in proportion as it paid the rent.

Further, Judge Ferren reasons that "it is not entirely clear" that HUD "has the right to a portion of the abatements vis-a-vis the tenant." Under a third party beneficiary theory, "for example," HUD may have relinquished to the tenant its right to rent that a court determines should not have been paid. But, as Judge Ferren acknowledges, this theory was never presented to the trial judge, and thus I do not see how she can be said to have abused her discretion in failing to consider it. Third party beneficiary analysis essentially asks what the contracting parties intended. While in general it is reasonable to assume Congress meant to permit tenants to sue to enforce rights under HAP contracts, *e.g., Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir.1981) (tenants may sue to recover retroactive benefits from HUD as third party beneficiaries); *Ashton v. Pierce,* 230 U.S.App.D.C. 252, 716 F.2d 56 (1983) (tenants may sue to enforce duties—specifically lead paint abatement obligations—under HUD contracts), it is quite a different thing to say that Congress, in Section 8, intended that government-paid rents would simply be transferred from landlord to tenant, sort of as damages, whenever a rent abatement is ordered under state law. That difficult issue should not influence our decision in a case in which the tenant has not preserved it in the trial court.

In sum, I find no basis for disturbing the trial judge's exercise of her equitable authority to achieve a result in this case that accords with the design and goals of the HUD program and is just to the parties before her. I would affirm outright. That, however, would leave us with no judgment of the court concerning future proceedings in this case. Reluctantly, therefore, I join Judge Steadman's proposed disposition remanding the case for further consideration by the trial court.